**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

**MARK E. HOLLIDAY, as Trustee**
**of the LB Litigation Trust,**

        **Plaintiff,**

        v.

**BROWN RUDNICK LLP,**

        **Defendant.**

------------------------------------------------------- x

      **Civil Action No. 1:19-CV-10925**

      **COMPLAINT**

      **(Jury Trial Demanded)**

      Plaintiff Mark E. Holliday, as Trustee of the LB Litigation Trust (the "**Trust**"), hereby files this action against Defendant Brown Rudnick LLP for legal malpractice in the litigation of the Trust's preference claim under Bankruptcy Code § 547(b) (the "**Preference Claim**") against Access Industries Holdings, LLC ("**Access**") in *Weisfelner v. Blavatnik (In re Lyondell Chemical Co.)* before the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

## I.    <u>INTRODUCTION</u>

    1.      **"Too little, too late**." That is how Brown Rudnick described any attempt by the firm to fix its clearly negligent representation of the Trust after losing the $300 million Preference Claim. Brown Rudnick further conceded that had it understood the case earlier and simply introduced a highly material piece of evidence into the record at summary judgment—or at any point during the trial—the Trust easily would have established that Lyondell Chemical Co. ("**Lyondell**"), the debtor that made the preferential transfers to Access, was insolvent. In fact, in the words of Brown Rudnick, had the firm identified and

introduced the case-determinative evidence, proving insolvency would not have even been "**a close call**."

2.      The failure to establish Lyondell's insolvency—a key element of the Preference Claim—was not the result of reasonable litigation strategy decisions. Rather, the Trust lost the Preference Claim because Brown Rudnick negligently failed to timely introduce evidence sufficient to maintain the statutory presumption of insolvency and, ultimately, to prove that Lyondell was insolvent when it made $300 million in transfers to Access in October 2008.

3.      In prosecuting the Preference Claim, Brown Rudnick solely analyzed the balance sheet of LyondellBasell Industries AF S.C.A. ("**LBI**"), the holding company of Lyondell and numerous related entities. Brown Rudnick shockingly never instructed the Trust's expert to value Lyondell, the debtor that made the transfers to Access. That error was compounded by trying to prove insolvency through reliance on LBI's financial projections dated after the preferential transfers when Brown Rudnick knew or should have known that there was a material change in LBI's and Lyondell's financial condition in the weeks after the transfers were made. In short, Brown Rudnick botched the insolvency analysis by valuing the ***wrong debtor*** and using financial projections from the ***wrong date***.

4.      Brown Rudnick, clearly not exercising due care, missed or ignored highly relevant and readily available evidence that would have established Lyondell was insolvent in October 2008. Specifically, as any reasonably prudent counsel would have known, Lyondell owed ***$8 billion in debt*** to other LBI entities, which included an

approximately $7.16 billion debt that Lyondell owed to LyondellBasell Finance Company (the "**Intercompany Note**"). Brown Rudnick did not timely identify the $8 billion in debt and ***never introduced the Intercompany Note into evidence***.

5.   When the Intercompany Note is considered in a balance-sheet insolvency test, the Trust easily could have established Lyondell's stand-alone insolvency—even using a conservative valuation of Lyondell's assets at any point in time in the year leading up to bankruptcy. In fact, had Brown Rudnick identified the Intercompany Note earlier, at the summary-judgment stage, Access would not have been able to rebut the presumption that Lyondell was insolvent.

6.   Access argued at summary judgment that Lyondell was solvent because the company had a value of roughly $13 billion with only $9 billion in debt. Access, however, did not include Lyondell's $8 billion debt in its calculation. Had Brown Rudnick simply introduced the $8 billion debt into evidence at summary judgment, the Trust would have completely decimated Access's solvency model. With the presumption of insolvency intact, the Trust would have won that issue at summary judgment and not have even needed to prove at trial that Lyondell was insolvent. Regardless, insolvency could easily have been shown if Brown Rudnick had analyzed the actual transferor (Lyondell, not LBI) in proving insolvency.

7.   Brown Rudnick's failure to introduce admissible evidence of Lyondell's insolvency as a stand-alone entity was not its only error. Brown Rudnick, without evidentiary and legal support, negligently used financial projections from LBI that ***post-dated*** the preferential transfers to try to prove LBI's insolvency in October 2008. This error

further doomed any attempt to use LBI's insolvency as a basis to argue that Lyondell was insolvent.

8.      Indeed, the Bankruptcy Court chided Brown Rudnick and the expert it retained, Anders Maxwell, for using financial projections from December 2008 when it was "undisputed" that "LBI's performance dropped off steeply in November and December 2008." Reasonably prudent counsel, in accordance with well-established bankruptcy law, could and would have ensured that the Trust's expert presented an opinion on Lyondell's insolvency that considered the changed circumstances between October and December 2008.

9.      In sum, counsel exercising the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession could and would have proved that *Lyondell* was insolvent in *October 2008* when it made $300 million in transfers to Access. And because all other elements of the Preference Claim were satisfied, and Access lacked credible defenses to the claim, the Trust would have prevailed on the claim.

10.      Brown Rudnick's failures were not mere tactical decisions, but pure legal and evidentiary errors within Brown Rudnick's control. Brown Rudnick is responsible to compensate the Trust for the loss of the Preference Claim.

## II.      JURISDICTION AND VENUE

11.      This Court has jurisdiction over this case under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

12.      Holliday, the Trustee, is a citizen of Oregon.

13.     Brown Rudnick's partners are citizens of New York, Massachusetts, Connecticut, Washington, D.C., Virginia, California, Maryland, and New Jersey. No Brown Rudnick partner is a citizen of Oregon.

14.      Venue is proper in this District because Brown Rudnick resides in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

15.     Because the engagement letter Brown Rudnick entered into with its senior partner (Edward Weisfelner, the former trustee) suggested that certain disputes were subject to arbitration, the Trust originally initiated an arbitration against Brown Rudnick in October 2019. Before an arbitrator was selected, Brown Rudnick stated in its answer that the arbitration clause under the heading "Fee Disputes" in the engagement letter did not apply to malpractice claims like those asserted herein. Brown Rudnick further contended that any arbitrator would lack jurisdiction over the case. In accordance with Brown Rudnick's position on jurisdiction and waiver of any right to arbitration that did exist, the Trust now files its claims in this Court.

### III.   **THE PARTIES**

16.     The Trust was created in connection with the confirmed chapter 11 plan for Lyondell and its affiliates in order to pursue claims for the benefit of their creditors.

17.     Holliday is the current Trustee of the Trust. Until May 3, 2019, Edward Weisfelner, a Brown Rudnick partner, served as trustee. Because Weisfelner was conflicted and would not agree to an amendment to the Trust Agreement to allow the Trust via the

Trust Advisory Board to pursue the malpractice claim against his own firm, the Trust Advisory Board removed Weisfelner and, on May 3, 2019, appointed Holliday as Trustee.

18.    Brown Rudnick, a Massachusetts limited liability partnership, is a large law firm with an office in, among other places, New York, New York. Among other work, Brown Rudnick represented the Trust in the Preference Claim against Access.

## IV.    FACTS

### A.    Lyondell Made $300 Million in Preferntial Transfers to Access in October 2008.

19.    The Preference Claim arises out of the aftermath of the December 2007 leveraged buyout ("**LBO**") of Lyondell by Basell B.V. ("**Basell**"), a Netherlands-based petrochemical company. The LBO was arranged by Basell's indirect owner, Access, which, in turn, is owned by Leonard Blavatnik, a U.S. multi-billionaire. After the closing of the buyout, Basell renamed itself LyondellBasell Industries, and Lyondell became one of its subsidiaries.[1]

20.    By early 2008, LBI began experiencing significant liquidity issues. On March 27, 2008, Lyondell and LBI entered into a $750 million unsecured revolving credit facility with Access (the "**Access Revolver**"). Under the terms of the Revolver, Lyondell was entitled to borrow on one day's notice to Access. Once it had borrowed, Lyondell was entitled to hold the money until September 28, 2009, but it could voluntarily repay the debt earlier.

---

[1] More detailed facts regarding the LBO and the Access Revolver are set out in detail in the opinions of the Bankruptcy Court and the District Court, *In re Lyondell Chem. Co.*, 567 B.R. 55 (Bankr. S.D.N.Y. 2017) and *In re Lyondell Chem. Co*, 585 B.R. 41 (S.D.N.Y. 2018).

21.     On October 15, 2008, Lyondell drew $300 million from the Access Revolver. The draw was repaid almost immediately in equal installments on October 16, 17, and 20, 2008. Lyondell's immediate repayments to Access, an insider of Lyondell, were the basis of the Preference Claim.

**B.     Lyondell Filed for Bankruptcy in 2009.**

22.     On January 6, 2009, Lyondell filed for bankruptcy, as did LBI just a few months later.

23.     The Trust was created under the Bankruptcy plan of reorganization of the LBI entities, effective April 30, 2010. The Trust prosecuted claims assigned to it by Lyondell and other LBI entities.

24.     Weisfelner, a senior partner at Brown Rudnick, was hired to serve as the trustee.

**C.     Brown Rudnick's Flawed Approach to the Litigation Caused the Trust to Lose the Preference Claim.**

25.     The Preference Claim was filed in July 2009 as a part of a larger action against multiple defendants. Over the years, the scope of the lawsuit narrowed as parties settled or were dismissed. Ultimately, the Preference Claim, along with several other remaining causes of action, was tried to the bench in mid-2016.

26.     The elements of a preference claim under 11 U.S.C. § 547(b) are well-known to all competent bankruptcy litigators. As a general matter, § 547(b) gives a trustee the power to avoid a transfer by the debtor to a creditor within 90 days prior to bankruptcy if

the debtor was insolvent at the time of the transfer. It also provides for a rebuttable presumption that the debtor was insolvent for that period.

27.     Brown Rudnick was charged with presenting evidence to satisfy each of these elements to prove the Trust's Preference Claim against Access and to defeat any affirmative defense to the Preference Claim raised by Access.

28.     Brown Rudnick breached its duties to the Trust because it neglected to introduce admissible and highly relevant evidence of Lyondell's insolvency.

**1.      Brown Rudnick's insolvency analysis focused on the wrong debtor.**

     **a.      Brown Rudnick negligently failed to gather and present evidence of Lyondell's stand-alone insolvency.**

29.     In the Preference Claim, Brown Rudnick alleged that Lyondell made the preferential transfers to Access. Brown Rudnick, however, inexplicably did not attempt to gather, understand, and present direct evidence of Lyondell's stand-alone insolvency.

30.     In fact, Brown Rudnick did not even instruct the Trust's expert, Maxwell, to value Lyondell. Instead, as set forth in Maxwell's report, Brown Rudnick asked him to value only LBI. Accordingly, Maxwell never offered an opinion on Lyondell's insolvency.

31.     Brown Rudnick took Maxwell's opinions on LBI's balance-sheet and argued that because Lyondell guaranteed LBI's debt, Lyondell was insolvent if LBI was insolvent. But because Maxwell and Brown Rudnick only analyzed LBI as the holding company for consolidated enterprise, they ignored inter-company liabilities of the subsidiaries, including Lyondell. Inter-company liabilities had no effect on the consolidated balance sheet but, as described further below, had material effects on Lyondell's balance sheet.

32.     Brown Rudnick should have known that its approach to the case made little sense because there was available, material evidence demonstrating that Lyondell was insolvent. This evidence could and should have been used to prove Lyondell's stand-alone insolvency at both the summary-judgment and, if necessary, trial stage of the case.

> **b.    Brown Rudnick's failure to consider Lyondell's $8 billion in intercompany liabilities resulted in the Trust losing the "presumption of insolvency" on summary judgment.**

33.     Under § 547(f) of the Bankruptcy Code, a debtor is presumed insolvent during the 90 days preceding its filing for bankruptcy. Lyondell made the $300 million in transfers to Access within 90 days prior to Lyondell's bankruptcy. Accordingly, Lyondell was presumed insolvent unless Access could produce some evidence that Lyondell was solvent. This "presumption of insolvency" is a significant advantage in a preference case.

34.     Brown Rudnick's analysis of the wrong debtor caused the loss of the presumption at the summary-judgment stage when the Bankruptcy Court held that Access had rebutted the presumption of insolvency of Lyondell. This result would have been avoided had Brown Rudnick simply considered the correct debtor (Lyondell, not LBI) and introduced into evidence Lyondell's ***$8 billion in debt*** to other LBI-owned entities.

35.     As stated above, approximately $7.16 billion of Lyondell's $8 billion in intercompany debt was evidenced by a Long-term Intercompany Loan Agreement (*i.e.*, the Intercompany Note), which Lyondell filed as an exhibit to its financial statements. But Brown Rudnick never considered Lyondell's stand-alone insolvency, addressed

Lyondell's balance sheet in any Rule 26 disclosures, or introduced the Intercompany Note into evidence, either at summary judgment or, as described below, at trial.

36.     Had Brown Rudnick analyzed Lyondell's balance sheet (as opposed to LBI's balance sheet) and introduced the Intercompany Note into evidence at the summary-judgment stage, Access would not have been able to rebut the presumption of insolvency. In opposition to the Trust's motion for summary, Access, which did analyze Lyondell's solvency, contended that Lyondell's stand-alone assets were worth approximately $11 to $15 billion, and that Lyondell's direct liabilities were around $9.1 billion. Access then argued because it was disputed whether Lyondell was liable under any guarantees, there was sufficient evidence that Lyondell was solvent to rebut the presumption.

37.     But, critically, Access's calculation of Lyondell's labilities excluded the Intercompany Note and related intercompany liabilities. Brown Rudnick, failing to exercise due care, completely missed this point. If just the Intercompany Note was added as a liability, then even under Access's calculation, Lyondell had at least $16.2 billion in direct liabilities. With $16.2 billion in direct liabilities (and without even accounting for potential liabilities under various guarantees), Access had absolutely no basis to rebut the presumption of insolvency, and insolvency would have been established.

38.     In short, if Brown Rudnick took Access's stand-alone valuation of Lyondell's assets and added the Intercompany Note to Lyondell's total liabilities, it would show that Lyondell was insolvent under Access's own model. If Access's own valuation model showed that Lyondell was insolvent by billions of dollars, then Access lacked evidence to rebut the presumption of insolvency. Because of its analysis of the wrong debtor and

corresponding failure to understand the relevant facts, Brown Rudnick never presented evidence of the Intercompany Note to the Bankruptcy Court at the summary-judgment stage.

39.     Adding to this error, Brown Rudnick stated in summary-judgment briefing that the Intercompany Note was "immaterial." Specifically, as part of its summary-judgment evidence, Access referenced the Intercompany Note to support its affirmative defense that the payments on the Access Revolver were "ordinary," stating:

> On December 20, 2007, Lyondell entered into a loan agreement with the Basell Group and received proceeds of $7.166 billion. As of September 30, 2008, the balance of the note payable relating to this loan agreement was $7.14 billion.

Failing to recognize that this debt rendered Lyondell insolvent on a stand-alone basis, Brown Rudnick responded that this evidence of Lyondell's $7.14 billion debt was "immaterial."

40.     Brown Rudnick's decision to call the Intercompany Note "immaterial" instead of using it to maintain the presumption of insolvency—and thus prevail on that issue at summary judgment—was not a reasonable decision. There is no rational basis for a decision not to use the Intercompany Note at summary judgment. Simply put, reasonably prudent counsel would have used Lyondell's *$8 billion debt* to win the insolvency issue at summary judgment. Brown Rudnick's failure to do so defies explanation.

41.     Brown Rudnick's failure to appreciate the significance of the Intercompany Note to Lyondell's solvency is particularly surprising because the Intercompany Note was

referenced in Lyondell's confirmed plan of reorganization. The Third Amended and Restated Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors (the "**Plan**") defined the Intercompany Note as "that certain intercompany note in the approximate amount of $7.2 billion owed by Lyondell Chemical [Lyondell] to LBFC [LyondellBasell Finance Company]."

42.     In sum, Brown Rudnick's negligent failure to present evidence of Lyondell's balance sheet and its related failure to understand the significance of the intercompany debts to Lyondell's stand-alone insolvency caused the Trust to lose the Preference Claim. The Bankruptcy Court did not have evidence of the Intercompany Note and related intercompany liabilities when considering whether the presumption of insolvency applied. Without key evidence that would have easily established that Lyondell's liabilities were almost double what Access claimed (*i.e.*, the Intercompany Note), the Bankruptcy Court found that Access had rebutted the presumption of insolvency. But for Brown Rudnick's negligence, the presumption would not have been rebutted, which would have allowed the Trust to prevail on the Preference Claim.

c.     **Brown Rudnick's last-minute effort to construct a valuation of Lyondell as a stand-alone entity was too little, too late.**

43.     Brown Rudnick's focus on the wrong debtor continued through trial where Brown Rudnick focused on a valuation of LBI, not Lyondell. It wasn't until the very end of the trial that Brown Rudnick appears to have discovered, at least in part, the error in its approach of focusing on LBI's balance sheet as opposed to Lyondell's balance sheet.

Brown Rudnick made some futile attempts to fix the problem it created by using its *post-trial* submissions to argue that Lyondell's insolvency was what mattered.

44.     The Bankruptcy Court rejected this belated post-trial effort to focus on Lyondell's stand-alone insolvency, stating:

> The Trustee did not argue that Lyondell (as opposed to LBI) was the relevant debtor for the preference claim **until his post-trial brief and closing arguments**. The Trustee's decision to switch focus from LBI to Lyondell forced the Trustee to extrapolate Lyondell's stand-alone financial condition from Maxwell's testimony regarding LBI's financial condition on a consolidated basis. . . .

> **The Court will not extrapolate Lyondell's stand-alone insolvency** based on Maxwell's unreliable testimony regarding LBI on a consolidated basis. **It bears repeating that the Trustee changed course on this issue at the eleventh hour, after arguing for the entire trial that LBI was the relevant entity for this determination**.

45.     An attorney exercising the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession would not have ignored the balance sheet of the debtor that actually made the preferential transfers. But this is what Brown Rudnick did. Had Brown Rudnick appropriately considered Lyondell's assets and liabilities on a stand-alone basis, it would have been a straightforward endeavor for the Trust to establish that Lyondell was balance-sheet insolvent when it made the preferential transfers to Access. This is true even with the loss of the presumption of insolvency.

46.     After the presumption of insolvency was rebutted, Brown Rudnick knew or should have known (much earlier than the end of the trial) that it was possible to, and that it should, value Lyondell's stand-alone assets for purposes of the trial.

47.     Specifically, as Brown Rudnick ultimately realized at the "eleventh hour," it was possible to use LBI's financial projections to arrive at a value for Lyondell because in its projections from 2007 and April 2008, LBI mostly broke out which portion of the financial projections pertained to Lyondell's business. Thus, the necessary evidence existed to calculate a valuation of Lyondell's assets.

48.     Brown Rudnick, apparently, eventually realized this sometime during the trial. Brown Rudnick first attempted to fix its failure to appropriately instruct Maxwell by trying to get Maxwell to testify to Lyondell's insolvency, despite Maxwell's never disclosing any opinion on Lyondell's value.

49.     The Bankruptcy Court refused to allow Brown Rudnick have Maxwell offer a new opinion on Lyondell's stand-alone insolvency at the last minute, because that opinion was not presented in the required Rule 26 disclosures and accompanying expert reports:

> Q.     And is there any information in your reports and in the record documents that you believe would assist the Court in assessing the solvency of Lyondell Chemical Company on a stand-alone basis?
>
> A.     The—the information to draw a conclusion in that regard is I believe contained in—is founded in the data that's included in my—my first report [which was a report valuing LBI as of December 2007, not the report purporting to value LBI as of October 2008].
>
> . . .
>
> The Court: Any of the opinions that you draw from PD-600 [a demonstrative exhibit] contained in any of your reports? Do you have the conclusions that you're presenting in PD-600 in any of your reports?
>
> Maxwell: I do not, Your Honor.

The Court: **Objection sustained**. . . . **You're attempting to introduce an opinion that's not contained in any of his expert reports**. . . . So the objection is sustained.

50.     After the Bankruptcy Court blocked Maxwell from testifying on Lyondell's stand-alone insolvency, Brown Rudnick tried through its post-trial brief to cobble together its own Lyondell valuation despite conceding that "Maxwell did not offer an opinion that Lyondell was insolvent on a stand-alone basis on October 20, 2008."

51.     In its post-trial brief Brown Rudnick argued for the first time that, as of December 2007, Lyondell contributed between 66% and 73% of LBI's total EBITDA and, as such, Lyondell's stand-alone value as of December 20, 2007, was approximately $15.389 billion. Brown Rudnick tried to use this extrapolation from December 2007 to argue that Lyondell was insolvent in October 2008.

52.     But, without actual evidence of the Intercompany Note or other debt instruments in the record, Brown Rudnick was left with the difficult task of trying to prove up the existence of the $8 billion in debt through statements about it in Lyondell's securities filings.

53.     For instance, in its post-trial brief, Brown Rudnick stated:

Lyondell's liabilities include $8.0 billion in long-term debt on account of a December 20, 2007 related party note payable (the "Related Party Note") that Lyondell entered into with parent LBI. The $8.0 billion Related Party Note was on account of an intercompany loan that Lyondell had borrowed from its parent company. The origin of the Related Party Note is described in Lyondell's Form 10-Q for the period ended September 30, 2008.

54.     This secondhand reference was the extent of Brown Rudnick's "evidence" of the $8 billion intercompany debt.

55.    The Bankruptcy Court, however, refused to consider counsel's post-trial efforts to arrive at an estimated valuation of Lyondell, because Brown Rudnick's valuation was not supported by actual expert evidence or analysis and was not set out in the legally-required pretrial disclosures.

56.    Notably, in closing arguments following post-trial briefing, the Bankruptcy Court clearly was interested in the $8 billion intercompany debt and its effect on Lyondell's balance sheet. But the Bankruptcy Court also was concerned that it could not consider the debt because the actual notes were not in evidence:

THE COURT: It wasn't a note; it was—was it a—is there a note—

MR. POHL: Yes—

THE COURT: —to the—

MR. POHL: —there's a note. **I don't have the note**, but this says there's a—there is a—

THE COURT: (Indiscernible)

MR. POHL: Note payable, it's got an interest rate, it's got a maturity date; it exists, according to this publicly filed report.

57.    Moreover, the Bankruptcy Court also expressed disbelief that Maxwell, as instructed by Brown Rudnick, never considered the Intercompany Loan in his valuation work:

THE COURT: **And did Mr. Maxwell, in his opinion on solvency, for October 2008, treat the eight-billion-dollar intercompany, the related party in debt, in his analysis?**

MR. POHL: **No, Your Honor**, because it's nonexistent in a consolidated.

. . .

THE COURT: -- one more time. **Did Mr. Maxwell consider, in his solvency analysis and the opinions that he rendered, the eight-billion-dollar**

**intercompany debt that you point to, DX-390, as showing?** I see it on the exhibit. But my question is whether Mr. Maxwell specifically took that into account in the opinion that he rendered with respect to October 2008 solvency.

MR. POHL: **No, he didn't, Your Honor**.

58.     Following closing arguments, in a last-ditch effort to try to rectify its clear failure to identify the massive debt earlier, Brown Rudnick submitted an unsolicited letter to the Bankruptcy Court in which it again focused on the relevance of the $8 billion intercompany debt to the insolvency issue.

59.     The fact that Brown Rudnick submitted an additional post-trial letter brief to the Bankruptcy Court to reiterate its belated arguments about Lyondell's massive liability illustrates the critical importance of the Intercompany Note to the solvency question. Brown Rudnick's post-trial submissions prove that Brown Rudnick negligently described the Intercompany Note as "immaterial" evidence at summary judgment.

60.     Access, of course, responded to this letter by emphasizing that Brown Rudnick never introduced debt instruments into evidence. And, as demonstrated by the Bankruptcy Court's opinion ruling against the Trust, the court did not consider the debt because Brown Rudnick never introduced the Intercompany Note or the other debt instruments into evidence.

61.     Brown Rudnick's post-trial submissions prove that the failure to introduce the Intercompany Note into evidence severely impaired the Trust's ability to establish Lyondell's insolvency. If Brown Rudnick had conducted even a cursory review of the

evidence as part of its preparation of the case, as prudent counsel would have done, Brown Rudnick would have discovered direct evidence of the Intercompany Note.

62.     If the Intercompany Note and other intercompany debt of approximately $800 million are added as liabilities to Lyondell's balance sheet, then Lyondell would have reported total liabilities well in excess of the value of its assets.

63.     In sum, had Brown Rudnick properly instructed an expert to value Lyondell, it is evident that an expert could have arrived at an opinion on the value of Lyondell's assets. And even a conservative valuation of Lyondell's assets would have demonstrated that Lyondell was insolvent because Lyondell owed massive intercompany liabilities, including the Intercompany Note. The failure to properly instruct Maxwell and to identify the $8 billion debt of Lyondell—an undisputedly material piece of evidence—were not strategic decisions by Brown Rudnick. Rather, these were critical mistakes by Brown Rudnick that no attorney exercising the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession would have made.

> **d.     Brown Rudnick conceded that it negligently handled the case, including with respect to the summary-judgment evidence.**

64.     As further described below, Brown Rudnick, on behalf of the Trust, appealed the loss of the Preference Claim to the U.S. District Court for the Southern District of New York (the "**District Court**"). To assist with the appeal, the Trust retained Kellogg, Hansen, Todd, Figel & Frederick PLLC ("**Kellogg Hansen**") to act as appellate counsel.

65.     In correspondence with Kellogg Hansen, Brown Rudnick admitted that the Trust could and would have won the affirmative case at summary judgment had Brown Rudnick simply used the Intercompany Note.[2]  In fact, several Brown Rudnick partners lamented the firm's failure to timely identify the $8 billion in debt to the Bankruptcy Court.

66.     In various correspondence and notes with Kellogg Hansen concerning the appeal of the Preference Claim, multiple Brown Rudnick partners recognized that had Brown Rudnick used the debt at summary judgment, the Trust would have won the case. These partners stated, among other things:

- "**[T]he computations that Access presented [at summary judgment] were carried out without reference to the $8bb intercompany claim**."

- "**The computations done to show LYO [Lyondell] was insolvent, even on the best case (to be confirmed), would fail and show insolvency once the $8bb IC claim is added**."

- "Quinn [counsel to Access] comes up with a best case for LCC standalone and how much 'solvency' cushion there is all of that was done excluding the $8bb - which, if included, I think absorbs all the cushion."

- "[N]otion that if LBI is solvent, LCC must be too - wrong based on 8 bb!!"

- "[W]ith record evidence of LCC standalone debt of over 21bb, this evidence supports it not being a close call for LCC."

- "Issues of [Lyondell's] share of contingent liabilities are not germane one [sic] you add in the 8BB interco."

67.     Unfortunately for the Trust and its beneficiaries, Brown Rudnick's realization about the importance of the $8 billion debt to the case was, as one Brown

---

[2] It is important to emphasize that Brown Rudnick refused to produce its client file, including its internal communications, to the Trust. The Trust obtained these documents from Kellogg Hansen, which responded to the Trust's request for its client file.

Rudnick partner put it to Kellogg Hansen, "**too little, too late**." These brutally honest assessments reveal Brown Rudnick's recognition of its own malpractice.

> **2.      Brown Rudnick's insolvency analysis focused on the wrong date.**
>
> > **a.      Brown Rudnick relied on December 2008 LBI projections without a factual or legal basis to do so.**

68.      Brown Rudnick's second, and equally fatal mistake, was relying on LBI's long-term projections as of December 2008 (the "**December 2008 projections**") to prove that LBI (and thus Lyondell) was insolvent months earlier, in October 2008. Brown Rudnick knew or should have known that, as a matter of well-established bankruptcy law, the Trust could not credibly use the December 2008 projections to prove that Lyondell was insolvent in October 2008. Brown Rudnick's ignorance or disregard of relevant caselaw caused the Trust to lose the Preference Claim.

69.      Numerous bankruptcy courts have recognized that "insolvency at a given point in time is often difficult to demonstrate by direct proof." Accordingly, courts permit trustees to introduce evidence of the debtor's financial condition either before or after the date of the alleged avoidable transfer to demonstrate the debtor's insolvency as of the date of the transfer. But, as Brown Rudnick knew or should have known, the caselaw is clear that a trustee may rely on evidence of insolvency from other dates only so long as the debtor's financial condition did not materially change in the interim.

70.      Here, it was obvious that LBI's (and Lyondell's) financial condition materially deteriorated between October 2008 and December 2008. There was no evidence

suggesting otherwise. In fact, even Maxwell acknowledged at trial that the great recession caused a dramatic decline in LBI's performance in November and December 2008.

71.     Access, capitalizing on Brown Rudnick's errors on the law and facts, repeatedly emphasized throughout the case that "[a]ny effort to use projections of LBI's prospects in late December 2008 or January 2009 fails to account for significant intervening events impacting LBI's business operations in November and December." Moreover, following trial, Access again reiterated that use of the December 2008 projections was inappropriate as a matter of law, stating: "Maxwell's use of December 2008 projections is improper and unreliable, both as a matter of fact and law."

72.     The Bankruptcy Court agreed, ruling: "Maxwell's use of the 2008 LRP Projections, which were not finalized and presented until December 2008, **is unpersuasive** as to LBI's financial condition two months earlier in mid-October 2008, in light of the substantial deterioration in LBI's financial performance thereafter."

73.     Maxwell tried to get around the issue by stating, in his expert report, that the December 2008 projections were "developed during the 2nd half of 2008 and available in October." But Brown Rudnick knew or should have known that there was no basis for this conclusion. Reasonably prudent counsel would not let an expert witness base an opinion on non-existent facts; but, perplexingly, this is exactly what Brown Rudnick did.

74.     The Bankruptcy Court chided Maxwell and Brown Rudnick for essentially trying to create evidence:

> Maxwell assumed that the December 2008 projections must have been fully drafted by mid-October 2008—despite failing to identify a single draft before December. Maxwell further assumed that even if projections were drafted in

October, those projections would not have been updated by December. **The Court finds that it strains credulity to believe that LBI would have fully drafted its projections in October (without producing any record of such drafts), watched the Great Recession begin to unfold all around it, discussed in December the dramatic decline of its business, and yet used the exact same numbers it drafted in October without a single change to reflect the economic decline of the last two months**.

75.     Because Brown Rudnick did not introduce any evidence concerning the value of either LBI or Lyondell in October 2008, the Bankruptcy Court held that it lacked a basis to find that Lyondell was insolvent when it made the transfers to Access.

> **b.     Brown Rudnick could have presented compelling evidence to prove that Lyondell was insolvent in October 2008.**

76.     Brown Rudnick's approach to proving Lyondell's insolvency made little sense given that, as Brown Rudnick knew or should have known, there were projections from earlier in the year that proved that Lyondell was insolvent and remained insolvent in October 2008.

77.     Specifically, Brown Rudnick knew or should have known, prior to submitting an expert report, that the evidence showed that the most recent long-term projections that Lyondell had at the time of the October 2008 transfers were projections created in April 2008 (the "**April 2008 projections**"). Had Brown Rudnick appropriately advised Maxwell on the facts and the applicable law governing the use of projections in insolvency analysis, Brown Rudnick and Maxwell could have used the April 2008 projections to demonstrate that Lyondell was insolvent.

78.     Critically, even employing a conservative analysis based on the April 2008 projections, it is clear Lyondell was insolvent in April 2008. And because there was no

dispute that Lyondell's condition worsened between April 2008 and October 2008, it would have been straightforward to establish that Lyondell was insolvent in October 2008. Having established that Lyondell was insolvent in April 2008, Brown Rudnick then could have used the December 2008 projections to buttress its argument that Lyondell remained insolvent through October 2008.

79.     Brown Rudnick's failure to use the April 2008 projections—which the evidence clearly established were the most current projections as of the date of the preferential transfers to Access—was a breach of the standard of care. And, as stated above, Lyondell's insolvency could have easily been proven using these same projections.

## D.     Brown Rudnick Compounded Its Negligence by Concealing Its Malpractice from the Trust's Advisory Board.

80.     The Trust was engaged in settlement discussions with Access prior to trial, during the trial, and after the trial. Critically, even after the trial (which, by all accounts, did not go well for the Trust), there was an opportunity for a meaningful settlement with Access.

81.     Brown Rudnick should have disclosed to the Trust Advisory Board that Brown Rudnick failed to timely introduce the evidence necessary to maintain the presumption of insolvency and, after negligently losing that presumption at summary judgment, to prove insolvency at trial. Brown Rudnick, however, did not provide a candid assessment of the claims.

82.     Had Brown Rudnick provided the Trust with honest and prudent advice in late 2016 and early 2017, the Trust could and would have settled its claims for a substantial sum.

**E.     Brown Rudnick Appealed to the District Court, But Without Evidence of Insolvency in the Record, the District Court Affirmed.**

83.     Brown Rudnick, on behalf of the Trust, appealed the case to the District Court. That court, in a January 24, 2018 opinion, affirmed the Bankruptcy Court's ruling.

84.     The District Court, like the Bankruptcy Court, began its opinion by finding that Brown Rudnick considered the wrong debtor in its insolvency analysis, stating:

> **In post-trial briefing, the Trustee contended that Lyondell was the appropriate debtor for this claim, and the bankruptcy court agreed. Nonetheless, Anders Maxwell's testimony focused entirely on LBI. He expressed no opinion whatsoever on the valuation of Lyondell as a stand-alone entity**. Only in post-trial briefing was an attempt made to extrapolate the valuation Maxwell provided for LBI to a valuation of Lyondell, without any testimony to support the Trustee's methodology. Although not dispositive of the Trustee's claims here, it does limit the extent to which any errors, even if found, could be deemed reversible.

85.     The District Court then agreed with the Bankruptcy Court's conclusion that Maxwell's testimony was "**seriously flawed**," with the "most troubling" part being "Maxwell's reliance on projections first presented to LBI's board in December 2008 to value LBI as of October 2008."

**F.     Brown Rudnick's Negligence Caused the Trust to Lose $300 Million.**

86.     Brown Rudnick analyzed the wrong debtor and the wrong date for the insolvency analysis. But for Brown Rudnick's failures, Access would not have rebutted the presumption of insolvency. Moreover, even leaving aside the presumption of insolvency, but for Brown Rudnick's negligence, the Trust could have used actual, pre-

existing evidence to prove Lyondell's stand-alone insolvency on the date of the preferential transfers. Because all of the other elements of the claim were satisfied, and Access's affirmative defenses lacked merit, the Trust would have prevailed on the Preference Claim.

87.     A $300 million recovery for the Trust would have considerably increased the return to the Trust's creditors. Because Weisfelner, the former Trustee, was conflicted and would not agree to an amendment to the Trust Agreement to permit the Trust Advisory Board to bring this malpractice claim, the Trust Advisory Board, on May 3, 2019, replaced Weisfelner with Holliday, the current Trustee.

## V.     DEMAND FOR JURY

88.     Plaintiff demands a jury trial on all issues.

## VI.     CLAIMS FOR RELIEF

### Count I: Legal Malpractice / Professional Negligence

### (Loss of the $300 Million Preference Claim)

89.     Plaintiff repeats and re-alleges the allegations set forth above.

90.     Brown Rudnick had an attorney–client relationship with the Trust.

91.     As counsel to the Trust, Brown Rudnick owed the Trust a duty to exercise reasonable and professional care consistent with the standard of care that is expected to be exercised by counsel in providing legal services. Brown Rudnick, however, did not exercise ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession.

92.     Brown Rudnick breached the standard of care when it, among other things, negligently failed to: understand the evidence concerning Lyondell's balance sheet; properly instruct the Trust's expert to value the correct debtor; introduce the Intercompany Note and related intercompany liabilities into evidence either at summary judgment or at trial; and apply established legal principles to its prosecution of the Preference Claim, including those principles governing how to use financial projections in insolvency analyses. In short, Brown Rudnick, through its unreasonable and negligent conduct, failed to prove the elements of the Trust's Preference Claim against Access.

93.     More specifically, as set forth above, Brown Rudnick failed to gather and present evidence that Lyondell, as opposed to LBI, was balance-sheet insolvent in October 2008. Brown Rudnick failed to present admissible evidence of $8 billion in intercompany debt that clearly rendered Lyondell balance-sheet insolvent. Instead, Brown Rudnick focused on the entire LBI enterprise, which ignored the intercompany debt and other factors.

94.     Further, as also explained above, Brown Rudnick failed to gather and present evidence of Lyondell's financial condition on the dates of the transfers in mid-October 2008, relying instead on December 2008 projections with insufficient explanation of the changed economic environment and the intervening changes in Lyondell's assets and liabilities.

95.     But for Brown Rudnick's negligence, the Trust could and would have retained the presumption of insolvency and, even if the presumption was somehow

rebutted, proved insolvency at trial. But for Brown Rudnick's negligence, the Trust would have prevailed against Access in the Preference Claim.

96.     Due to Brown Rudnick's failure to win the insolvency issue at summary judgment, the Trust needlessly had to pay Brown Rudnick and Maxwell to litigate that issue at trial. More importantly, as a direct and proximate result of Brown Rudnick's malpractice, the Trust lost $300 million, plus interest, that would have been awarded on the Preference Claim.

97.     In sum, as a direct and proximate result of Brown Rudnick's negligence, the Trust suffered more than $300 million in damages.

## Count II: Legal Malpractice / Professional Negligence
### (Lost Settlement Value)

98.     Plaintiff repeats and re-alleges the allegations set forth above.

99.     Brown Rudnick had an attorney–client relationship with the Trust.

100.     As counsel to the Trust, Brown Rudnick owed the Trust a duty to exercise reasonable and professional care consistent with the standard of care that is expected to be exercised by counsel in providing legal services. Brown Rudnick, however, did not exercise ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession.

101.     Brown Rudnick breached the standard of care when it, among other things, negligently failed to appropriately advise the Trust in late 2016 and early 2017 about the merits of the Preference Claim in light of Brown Rudnick's evidentiary failings.

Concealing its own negligence, Brown Rudnick negligently or intentionally mislead the Trust Advisory Board about the Trust's likelihood of success.

102.    As a direct and proximate result of Brown Rudnick's professional negligence, the Trust lost the settlement value of the Preference Claim, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

103.    WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor for the following:

a.    Actual and compensatory damages, including damages equal to the amount the value of the Preference Claim;

b.    Pre- and post-award interest at the highest rate and amount authorized by applicable law;

c.    An award of costs related to this proceeding, including attorneys' fees; and

d.    Such other and further relief at law or in equity as the Court deems just and appropriate.

Dated:  November 26, 2019                    REID COLLINS & TSAI LLP

 /s/ William T. Reid, IV
William T. Reid, IV
wreid@rctlegal.com
Marc Dworsky
mdworsky@rctlegal.com
810 Seventh Avenue, Suite 410
New York, New York
212-344-5200

Joshua J. Bruckerhoff (*pro hac vice* to be filed)
jbruckerhoff@rctlegal.com

Barbara Whiten Balliette (*pro hac vice* to be filed)
bballiette@rctlegal.com
1301 S. Capital of Texas, C-300
Austin, Texas 78746
512-647-6100

*Counsel for Plaintiff*