## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x

**MARK E. HOLLIDAY, as Trustee**
**of the LB Litigation Trust,**

        **Plaintiff,**

        v.

**BROWN RUDNICK LLP,**

        **Defendant.**

------------------------------------------------------ x

**Civil Action No. 1:19-CV-10925**

**FIRST AMENDED COMPLAINT**

**(Jury Trial Demanded)**

Plaintiff Mark E. Holliday, as Trustee of the LB Litigation Trust (the "**Trust**"), hereby files this action against Defendant, Brown Rudnick LLP, for legal malpractice in the litigation of the Trust's preference claim under Bankruptcy Code § 547(b) (the "**Preference Claim**") against Access Industries Holdings, LLC ("**Access**") in *Weisfelner v. Blavatnik (In re Lyondell Chemical Co.)* before the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

## I.     INTRODUCTION

1.      "***Too little, too late***." That is how Brown Rudnick described its own attempt to fix its clearly negligent representation of the Trust after it lost the $300 million Preference Claim at issue in this case. Although the Preference Claim arose out of the collapse of a multibillion-dollar business, the claim was—or, more aptly, should have been—straightforward, especially for bankruptcy practitioners. To prevail, Brown Rudnick had to show that Lyondell Chemical Co. ("**Lyondell**"), a debtor in the bankruptcy case, was insolvent when it made $300 million in preferential transfers to Access in October 2008. Although the facts clearly supported the insolvency finding, Brown Rudnick's legal errors left it unable to prove as much, directly resulting

in the loss of $300 million in recoveries for the Trust, which gives rise to this claim for legal malpractice.

2.     Importantly, under the Bankruptcy Code, Lyondell, like all debtors in a preference case, was *presumed insolvent* unless the defendant presented evidence otherwise. Accordingly, to rebut the presumption, the defendant (Access) argued that Lyondell was, in fact, solvent because it had a value of roughly $12 to $13 billion with only $9 billion in debt. It was then up to Brown Rudnick to demonstrate why Access's argument was incorrect, maintain the presumption of insolvency, and thus establish all elements of the $300 million Preference Claim.

3.     There was at least one obvious and dispositive problem with Access's solvency calculation: *it completely failed to account for an additional $8 billion in intercompany debt Lyondell owed*. As a matter of simple arithmetic, adding the $8 billion in Lyondell's intercompany debt to Access's version of Lyondell's balance sheet rendered Lyondell insolvent by billions of dollars.[1] Unfortunately for the Trust and its beneficiaries, *Brown Rudnick inexplicably missed this critical piece of evidence until it was too late*.

4.     If Brown Rudnick simply introduced Lyondell's $8 billion intercompany debt into evidence when Access, in response to the Trust's affirmative motion for summary judgment, moved to rebut the presumption of insolvency, the Trust could have used Access's own version of Lyondell's balance sheet to prove that Lyondell was actually insolvent by billions of dollars. The Trust then would have retained the presumption of insolvency, and thus proven insolvency at the summary-judgment stage. Further, regardless of whether the Trust won at summary judgment, with the presumption of insolvency intact throughout trial, the Trust would have succeeded on the

---

[1] Specifically, as any reasonably prudent counsel would have known, Lyondell owed $8 billion in debt to other LBI entities, which included an approximately $7.16 billion debt that Lyondell owed to LyondellBasell Finance Company.

Preference Claim because, as the Bankruptcy Court found, the Trust proved all other elements of its affirmative claim.

5.      How did Brown Rudnick make such a colossal mistake? In short, Brown Rudnick tried the wrong case. Brown Rudnick set out to prove that the holding company that owned Lyondell, not Lyondell itself, was insolvent. As the Bankruptcy Court found, Brown Rudnick "**chose not to present specific evidence of Lyondell's stand-alone insolvency**."[2] Specifically, Brown Rudnick did not instruct the Trust's expert to value Lyondell independently, and thus, at summary judgment and at trial, the Trust had no expert opinion at all on Lyondell's insolvency. Compounding the problem, Brown Rudnick also failed to present other specific evidence of Lyondell's assets and liabilities at trial.

6.      No attorney exercising the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession would have tried a preference claim—much less a $300 million preference claim—without even attempting to determine the assets and liabilities of the debtor that actually made the preferential transfer (Lyondell). This was not a "strategy call," but rather a fatal legal error. There is no justification for Brown Rudnick's failure to consider Lyondell's stand-alone insolvency during the case. It was not until **post-trial** closing arguments— in what the Bankruptcy Court described as an "eleventh hour" change in the theory of the claim— that Brown Rudnick tried to cobble together an argument about Lyondell's stand-alone insolvency.[3] Of course, by then, it was, in Brown Rudnick's own words, "too little, too late."

---

[2] *In re Lyondell Chem. Co.*, 567 B.R. 55, 107 (Bankr. S.D.N.Y. 2017) (emphasis added), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018).

[3] *Id.* at 149; *see also id.* at 107 ("The Trustee argued during closing argument that Lyondell's stand-alone insolvency on October 20, 2008, is the relevant date for his avoidance claim. This represented a change in the Trustee's theory of this claim, which until closing argument focused on LBI's alleged insolvency. *Such a late change in theory is highly questionable*." (emphasis added)).

7.      Brown Rudnick's approach to the solvency analysis—in which it solely analyzed the balance sheet of LyondellBasell Industries AF S.C.A. ("**LBI**"), the holding company of Lyondell and numerous related entities—was nonsensical, when, under any metric, Lyondell was insolvent on a stand-alone basis. By solely analyzing the wrong entity's solvency, Brown Rudnick needlessly turned proving Lyondell's insolvency from something that it acknowledged should not have been a "close call," into a much more difficult, and legally problematic, issue.

8.      Because the $8 billion debt owed by Lyondell was an intercompany debt, this debt netted out when calculating LBI's solvency. But the starting point for proving insolvency in any preference case is the transferor debtor, not its parent or holding company.[4] Lyondell was clearly insolvent even if its holding company was not. That Brown Rudnick could have used the defendant's own solvency analysis and simply included the existing and undisputed $8 billion debt to show Lyondell's insolvency—and thus prevail on that issue—illustrates the firm's negligence. There was no strategy call to lose the presumption of insolvency and, with it, the clear path to prevailing on the Preference Claim by showing Lyondell's insolvency.

9.      Brown Rudnick's failure to present specific evidence of Lyondell's stand-alone insolvency was not its only error. Instead of valuing LBI (Lyondell's holding company) on the date of the preferential transfers by using preexisting projections, Brown Rudnick used financial projections that ***post-dated*** the preferential transfers. Under well-established caselaw, in what is sometimes referred to as a "retrojection" analysis, if a trustee shows that the debtor was insolvent at a time subsequent to the date of the alleged voidable transfer, "the trustee must also show that the debtors' financial condition *did not change* during the interim period."[5] Brown Rudnick

---

[4] Indeed, Lyondell filed for bankruptcy in January 2009, less than three months after the preferential transfers, while LBI did not file its own bankruptcy until several months later.

[5] *See In re Jesup & Lamont, Inc.*, 507 B.R. 452, 473 (Bankr. S.D.N.Y. 2014) (emphasis added).

disregarded this caselaw and essentially just assumed, without a reliable factual basis, that LBI's projections from December 2008 were sufficient to prove insolvency in October 2008, the date of the transfers. Brown Rudnick's assumption was objectively unreasonable because it required the Bankruptcy Court to ignore the effects of two of the worst months of the so-called Great Recession on Lyondell's business. Under existing law, absent proof that there were no changed circumstances in the October to December 2008 time frame, Brown Rudnick had doomed its attempt to use LBI's insolvency on the date of the transfer as a basis to argue, indirectly, that Lyondell was insolvent.

10.    Predictably, the Bankruptcy Court soundly rejected Brown Rudnick's attempt to use a "retrojection" analysis. Indeed, the Bankruptcy Court chided Brown Rudnick and the expert it retained, Anders Maxwell, for using financial projections from December 2008 when it was "undisputed" that "LBI's performance dropped off steeply in November and December 2008."[6] At a minimum, reasonably prudent counsel would have ensured that it and the Trust's expert presented evidence on LBI's insolvency that considered the changed circumstances between October and December 2008. Better still, competent counsel would have ensured that it and the Trust's expert actually valued Lyondell as of October 2008 using preexisting projections. But Brown Rudnick did not choose between two viable strategies; it chose a legally incorrect path.

11.    In sum, Brown Rudnick botched the insolvency analysis by valuing the ***wrong debtor*** and using financial projections from the ***wrong date***. Counsel exercising the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession could and would have proved that ***Lyondell*** (the relevant debtor) was insolvent in ***October 2008*** (the relevant date) when it made $300 million in transfers to Access. Because all other elements of the Preference Claim were satisfied (as the Bankruptcy Court held)—and Access lacked credible

---

[6] *See In re Lyondell Chem. Co.*, 567 B.R. at 105.

defenses to the claim—but for Brown Rudnick's negligence, the Trust would have prevailed on the Preference Claim.

12.     Brown Rudnick's failures were not mere tactical choices, but pure legal and evidentiary errors wholly within Brown Rudnick's control. Brown Rudnick is responsible to the Trust for the loss of the Preference Claim.

13.     Although Brown Rudnick recognized its own malpractice (as demonstrated by its admissions in correspondence with co-counsel after losing the Preference Claim), at no point did Brown Rudnick ever admit to the Trust, including the members Trust Advisory Board, that it had botched the Preference Claim.

14.     Only after one of the beneficiaries of the Trust offered to buy this malpractice claim did the Trust Advisory Board hire independent counsel and a former bankruptcy judge to investigate the circumstance of how the Preference Claim was lost. The Trust Advisory Board, after conducting its investigation, concluded that meritorious claims existed against Brown Rudnick and retained the undersigned counsel to pursue them.

15.     Brown Rudnick and its partner, Edward Weisfelner, who was trustee of the Trust during Brown Rudnick's prosecution of the Preference Claim, have consistently opposed all efforts by the Trust to pursue the malpractice claims asserted herein. Notably, Weisfelner, despite his clear conflict of interest, sent a notice to the Trust's beneficiaries stating that he "does not believe there are viable claims or causes of action" against his partners at Brown Rudnick. Weisfelner also, prior to his removal and replacement, threatened the Trust Advisory Board with objectively baseless claims if the Trust Advisory Board took actions (such as removing Weisfelner) to ensure that the Trust pursued its malpractice claims against Brown Rudnick. Then, following his removal,

Weisfelner claimed that he had the right to dispute his removal as trustee and again threatened meritless claims against members of the Trust Advisory Board.

16.     In addition, Brown Rudnick has refused to turn over the Trust's client file to Holliday, the successor trustee, unless the Trust paid a ransom for the release of these files. Consequently, the allegations in this First Amended Complaint are being made without access to the Trust's client file, which the Trust believes will only bolster its allegations. Meanwhile, Brown Rudnick's refusal to turn over the client file to the Trust in violation of applicable ethics rules, and which is itself a breach of fiduciary duty, has hindered the Trust's ability to prosecute this malpractice action fully.

## II.     JURISDICTION AND VENUE

17.     This Court has jurisdiction over this case under 28 U.S.C. § 1332(b) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

18.     Holliday, the Trustee, is a citizen of Oregon.

19.     Brown Rudnick's partners are citizens of New York, Massachusetts, Connecticut, Washington, D.C., Virginia, California, Maryland, and New Jersey. No Brown Rudnick partner is a citizen of Oregon.

20.      Venue is proper in this District because Brown Rudnick resides in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

21.     Because the engagement letter Brown Rudnick entered into with its senior partner (Weisfelner, the former trustee) suggested that certain disputes were subject to arbitration, the Trust originally initiated an arbitration against Brown Rudnick in October 2019. Before an arbitrator was selected, Brown Rudnick stated in its answer that the arbitration clause under the heading "Fee Disputes" in the engagement letter did not apply to malpractice claims like those asserted herein.

Brown Rudnick further contended that any arbitrator would lack jurisdiction over the case. In accordance with Brown Rudnick's position on jurisdiction and waiver of any right to arbitration that may have existed, the Trust commenced this action.

### III.    THE PARTIES

22.    The Trust was created in connection with the confirmed Chapter 11 plan for Lyondell and its affiliates in order to pursue claims for the benefit of their creditors.

23.    Holliday is the current Trustee of the Trust. Until May 3, 2019, Weisfelner, a Brown Rudnick partner, served as trustee. Because Weisfelner was conflicted and obviously would not pursue the Trust's malpractice claims against his own law firm, the Trust Advisory Board removed Weisfelner. On May 3, 2019, the Trust Advisory Board appointed Holliday as successor Trustee.

24.    Brown Rudnick is a law firm with an office in, among other places, New York, New York.

### IV.    FACTS

**A.    Lyondell Made $300 Million in Preferential Transfers to Access in October 2008.**

25.    The Preference Claim arose out of the aftermath of the December 2007 leveraged buyout ("**LBO**") of Lyondell by Basell B.V. ("**Basell**"), a Netherlands-based petrochemical company. The LBO was arranged by Basell's indirect owner, Access, which, in turn, is owned by Leonard Blavatnik, a U.S. multi-billionaire. After the closing of the buyout, Basell renamed itself LyondellBasell Industries, and Lyondell became one of its subsidiaries.[7]

26.    By early 2008, LBI began experiencing significant liquidity issues. On March 27, 2008, Lyondell and LBI entered into a $750 million unsecured revolving credit facility with Access

---

[7] More detailed facts regarding the LBO and the Access Revolver are set out in detail in the opinions of the Bankruptcy Court, *In re Lyondell Chem. Co.*, 567 B.R. 55 (Bankr. S.D.N.Y. 2017), and the District Court, *In re Lyondell Chem. Co*, 585 B.R. 41 (S.D.N.Y. 2018).

(the "**Access Revolver**"). Under the terms of the Revolver, Lyondell was entitled to borrow on one day's notice to Access. Once it had borrowed, Lyondell was entitled to hold the money until September 28, 2009, but it could voluntarily repay the debt earlier.

27.     On October 15, 2008, Lyondell drew $300 million from the Access Revolver. The draw was repaid almost immediately in equal installments on October 16, 17, and 20, 2008 (the "**Preference Payment Dates**"). Lyondell's immediate repayments to Access, an insider of Lyondell, within 90 days of the Petition Date (as defined below), were the basis of the Preference Claim.

**B.      Lyondell Filed for Bankruptcy in 2009.**

28.     On January 6, 2009 (the "**Petition Date**"), Lyondell filed for bankruptcy, as did LBI just a few months later.

29.     The Trust was created under the Chapter 11 plan of reorganization of the LBI entities (the "**Plan**"), which became effective on April 30, 2010. Pursuant to the Plan, Lyondell assigned certain claims, including the Preference Claim, to the Trust.

30.     Weisfelner, a senior partner at Brown Rudnick, was designated trustee of the Trust.

**C.      Brown Rudnick's Flawed Approach to the Litigation Caused the Trust to Lose the Preference Claim.**

31.     The Preference Claim was filed in July 2009 as a part of a larger action asserting various claims against multiple defendants. Over the years, the scope of the lawsuit narrowed as parties settled or were dismissed. Ultimately, the Preference Claim, along with several other remaining causes of action, was tried to the bench in mid-2016.

32.     The elements of a preference claim under 11 U.S.C. § 547(b) are well-known to all competent bankruptcy lawyers. As a general matter, § 547(b) gives a trustee the power to avoid a transfer by the debtor to a creditor within 90 days prior to bankruptcy if the debtor was insolvent at

the time of the transfer. The statute also provides for a presumption that the debtor was insolvent during that 90-day period.

33.     Brown Rudnick was charged with presenting evidence to satisfy each of these elements to prove the Trust's Preference Claim against Access and to defeat any affirmative defense to the Preference Claim raised by Access.

34.     Brown Rudnick breached its duties to the Trust because it neglected to introduce admissible and highly relevant evidence of Lyondell's insolvency and negligently failed to prove Lyondell's insolvency on the Preference Payment Dates.[8]

**1.      Brown Rudnick prosecuted the Preference Claim without evidence of Lyondell's insolvency.**

**a.      Brown Rudnick negligently failed to gather and present evidence of Lyondell's stand-alone insolvency.**

35.     In the Preference Claim, Brown Rudnick alleged that Lyondell made the preferential transfers to Access. Brown Rudnick, however, inexplicably did not attempt to gather, understand, and present direct evidence of Lyondell's stand-alone insolvency. As the Bankruptcy Court recognized: "***The Trustee chose not to present specific evidence of Lyondell's stand-alone***

---

[8] In addition to the negligent conduct described herein, Brown Rudnick committed the strategic blunder of retaining Maxwell to offer an opinion as to LBI's insolvency in late 2008, even though Maxwell had previously opined, as part of the bankruptcy proceeding, that LBI was likely solvent in January 2009. *See In re Lyondell Chem. Co.*, 567 B.R. at 65 ("Maxwell was retained in 2009 by the Creditors' Committee to critique a valuation conducted by Duff & Phelps in connection with LBI's proposed DIP financing. Maxwell found a significantly higher DCF value for LBI in 2009, on behalf of the Creditors' Committee, than he did in 2011, on behalf of the Trustee. Using his 2009 DCF value, LBI was solvent; by 2011, when Maxwell was working on this litigation, he had completely changed his opinion to conclude that LBI was insolvent. Maxwell never adequately explained this inconsistency at trial, attributing the difference in value to a disclaimer in his 2009 work on behalf of the Creditors' Committee that he was operating on a compressed timeframe. But Maxwell's change of tune cannot be explained simply by having more time to work—he made significant changes to his methodology, with the result that his opinion had completely changed for litigation purposes."). The decision to use Maxwell, while questionable, does not form the basis for this malpractice action. But it should be noted that had Brown Rudnick advised Maxwell to value Lyondell as opposed to LBI, Brown Rudnick could have avoided some of the inconsistencies in his opinions that the Bankruptcy Court found troubling from a credibility perspective. This is because, as explained below, Lyondell was insolvent regardless of whether LBI was technically insolvent.

*insolvency at trial*."[9] This choice constitutes malpractice, and it caused the Trust to lose the Preference Claim.

36.     In fact, Brown Rudnick did not even instruct the Trust's expert, Maxwell, to value the correct debtor, Lyondell. Instead, as set forth in Maxwell's report, Brown Rudnick asked him to value only the holding company, LBI. Accordingly, Maxwell never offered an opinion on Lyondell's assets or liabilities, and Brown Rudnick never secured any other expert who could testify on the subject. Thus, because of Brown Rudnick's negligent advice, the Trust tried the $300 million Preference Claim *without any expert opinion on the insolvency of the relevant debtor*. This was no strategic error; it was a legal blunder.

37.     Rather than analyzing Lyondell's balance sheet, Brown Rudnick took Maxwell's opinions on LBI's balance-sheet and argued that because Lyondell guaranteed LBI's debt, Lyondell was insolvent if LBI was insolvent. That is, under Brown Rudnick's theory, Lyondell was only insolvent if LBI was insolvent.

38.     But, as any attorney exercising ordinary and reasonable skill and knowledge would have known, *Lyondell's insolvency was not dependent on a finding that LBI also was insolvent*. It was entirely possible for Lyondell to be insolvent even if LBI was solvent. In fact, because the intercompany debt owed by Lyondell to other LBI entities netted out at the LBI level, it was $8 billion easier to show Lyondell's insolvency than LBI's insolvency.

39.     No attorney exercising the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession would have gone to trial without attempting to consider the stand-alone balance sheet of Lyondell. And no attorney exercising the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession would

---

[9] *Id.* at 107 (emphasis added).

have gone to trial without an expert opinion on Lyondell's stand-alone insolvency. Simply put, Brown Rudnick should have known that its approach to the case made little sense because there was available, material evidence clearly demonstrating that Lyondell was insolvent. This evidence could and should have been used to maintain the presumption of insolvency and, if necessary, prove insolvency at the trial.

> **b.    Brown Rudnick's failure to consider Lyondell's $8 billion in intercompany liabilities resulted in the Trust losing the "presumption of insolvency" on summary judgment.**

40.    Under § 547(f) of the Bankruptcy Code, a debtor is presumed insolvent during the 90 days preceding the date of its bankruptcy filing. Lyondell made the $300 million in transfers to Access within 90 days prior to Lyondell's bankruptcy filing. Accordingly, Lyondell was presumed insolvent as a matter of law unless Access could produce some evidence that Lyondell was solvent. This "presumption of insolvency" is a significant advantage for a debtor in a preference case. Indeed, summary judgment is appropriate for a trustee when the defendant seeking to rebut the presumption fails to do so.

41.    Brown Rudnick, on behalf of the Trust, moved for summary judgment on the Preference Claim. But Brown Rudnick's analysis of the wrong debtor caused the Trust not only to lose its motion for summary judgment, but also the presumption of insolvency. This result would have been avoided—that is, the Trust would have proved that Lyondell was insolvent—had Brown Rudnick simply considered the correct debtor (Lyondell, not LBI) and introduced into evidence Lyondell's *$8 billion in debt* to other LBI-owned entities.

42.    Specifically, in opposition to the Trust's motion for summary judgment, Access contended that Lyondell's stand-alone assets were worth approximately $10.9 to $15.6 billion. Notably, after reviewing Maxwell's legally and factually flawed expert report on LBI, Access did not even retain its own expert to value either LBI or Lyondell in October 2008. Access, however,

presented multiple non-expert valuations of Lyondell on a stand-alone basis to try to rebut the presumption of insolvency.

43.     For instance, Access adjusted a December 2007 valuation of Lyondell, as determined by Citigroup, to arrive at an October 2008 value of Lyondell's assets of around $12 billion, stating, *inter alia*:

> If the valuation range determined for Lyondell by Citigroup in December 2007 is reduced by 26.3% (representing the weighted average decline in enterprise value of comparable companies between December 20, 2007 and October 20, 2008 calculated using the methodology used by Mr. Maxwell), the range would be $12.09 billion to $13.34 billion, for a midpoint of ***$12.7 billion***.

> If the valuation range determined for Lyondell by Citigroup in December 2007 is reduced by 33.5% (representing the weighted median decline in enterprise value of comparable companies between December 20, 2007 and October 20, 2008 calculated using the methodology used by Mr. Maxwell), the range would be $10.9 billion to $12.0 billion, for a midpoint of ***$11.5 billion***. (Emphasis added.)

Access also relied on one of its experts (who performed a valuation as of December 2007 for a different claim) to arrive at a stand-alone valuation of Lyondell in October 2008. Based on work performed by its expert, Access determined that Lyondell had a stand-alone value of between $14.4 billion to $18.7 billion as of December 2007. Access then reduced those valuations by 26.3% to represent the estimated decline in Lyondell's value from December 2007 to October 2008. After making that adjustment, ***Access concluded that Lyondell had a low-end value of $10.6 billion and a mid-point value of $12.23 billion as of October 2008***.

44.     Access argued that these valuations showed Lyondell's solvency because, according to Access, Lyondell's direct liabilities were around $9.1 billion. Access further argued that because it was disputed whether Lyondell was liable under any guarantees, there was sufficient evidence to rebut the presumption of insolvency.

45.     But, critically, ***Access's calculation of Lyondell's liabilities <u>excluded</u> the $8 billion intercompany debt***. Approximately $7.16 billion of Lyondell's $8 billion in intercompany debt was

evidenced by a Long-term Intercompany Loan Agreement between Lyondell and LyondellBasell Finance Company (the "**Intercompany Note**"), which Lyondell filed as an exhibit to its financial statements.[10]

46.     No reasonably prudent counsel in Brown Rudnick's position would have overlooked Lyondell's $8 billion intercompany debt. If just the Intercompany Note was added as a liability, then even under Access's calculation, Lyondell would have had at least $16.2 billion in direct liabilities. With $16.2 billion in direct liabilities (and without even accounting for other direct liabilities and potential liabilities under various guarantees), Lyondell's debt clearly exceeded Access's valuation of Lyondell's assets.

47.     All Brown Rudnick had to do was advise the Bankruptcy Court that $16.2 billion in liabilities exceeds $12.23 billion in assets (the mid-point valuation based on Access's own expert work). Had Brown Rudnick done this—as any reasonably competent attorney would have done— Access would have had absolutely no basis to rebut the presumption of insolvency. In fact, if Brown Rudnick had used any of Access's stand-alone valuations of Lyondell's assets and included the $8 billion debt in Lyondell's total liabilities, Brown Rudnick would have shown that Lyondell was clearly insolvent. If Access's own valuation models after accounting for Lyondell's $8 billion in intercompany debt showed that Lyondell was insolvent by billions of dollars, then Access lacked evidence to rebut the presumption of insolvency.

---

[10] Brown Rudnick's failure to appreciate the significance of the Intercompany Note to Lyondell's solvency is particularly surprising because the Intercompany Note also was referenced in Lyondell's confirmed plan of reorganization. The Third Amended and Restated Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors defined the Intercompany Note as "that certain intercompany note in the approximate amount of $7.2 billion owed by Lyondell Chemical [Lyondell] to LBFC [LyondellBasell Finance Company]." The Plan demonstrates that the Intercompany Note was not, as Brown Rudnick wrongly believed, just part of LBI's overall consolidated cash management approach. The Intercompany Note, and the debt of Lyondell it represented, was a material piece of evidence. Brown Rudnick, however, wrongly represented to the Bankruptcy Court that the Intercompany Note was "immaterial," as described in more detail below.

48.     But because Brown Rudnick analyzed the wrong debtor and correspondingly failed to understand the relevant facts, Brown Rudnick never presented any evidence of the $8 billion debt (much less direct evidence of the Intercompany Note) to the Bankruptcy Court at summary judgment.

49.     Brown Rudnick even had a perfect opportunity to highlight the $8 billion debt to the Bankruptcy Court during summary judgment—but because the attorneys were solely focused on the solvency of the wrong entity (LBI as opposed to Lyondell), Brown Rudnick squandered the chance. Specifically, as part of its summary-judgment evidence, Access itself referenced the Intercompany Note to support its affirmative defense that the payments on the Access Revolver were "ordinary," stating:

> On December 20, 2007, Lyondell entered into a loan agreement with the Basell Group and received proceeds of $7.166 billion. As of September 30, 2008, the balance of the note payable relating to this loan agreement was $7.14 billion.

But Brown Rudnick, because of its negligence, failed to recognize that this debt (*i.e.*, the Intercompany Note) rendered Lyondell insolvent on a stand-alone basis. In fact, rather shockingly, Brown Rudnick responded that this evidence of Lyondell's $7.14 billion debt was "immaterial."

50.     ***Brown Rudnick's decision to call the Intercompany Note "immaterial" instead of using it to maintain the presumption of insolvency—and thus prove that Lyondell was insolvent as a matter of law—obviously was not a reasonable decision***. It is not and cannot ever be a reasonable decision to make a choice in litigation that directly prevents a client from succeeding on an element of its claim.

51.     It was not a "strategy" call, but rather a fundamental misunderstanding of the claim for Brown Rudnick to completely ignore the evidence to win the case. There was no rational basis for Brown Rudnick's decision not to use the $8 billion debt and the Intercompany Note at summary

judgment. Simply put, reasonably prudent counsel would have used Lyondell's $8 billion debt to win the insolvency issue. Brown Rudnick's failure to do so defies explanation.

52.     In sum, Brown Rudnick's negligent failure to present evidence of Lyondell's balance sheet and its related failure to understand the significance of the intercompany debts to Lyondell's stand-alone insolvency caused the Trust to lose the Preference Claim. The Bankruptcy Court did not have evidence of the Intercompany Note and related intercompany liabilities when considering whether the presumption of insolvency applied. Without key evidence that would have easily established that Lyondell's liabilities were almost double what Access claimed, the Bankruptcy Court found that Access had rebutted the presumption of insolvency. But for Brown Rudnick's negligence, the presumption would not have been rebutted, and the Trust would have prevailed on the Preference Claim.

53.     Brown Rudnick cannot dispute this outcome because, as explained further below, after the trial was over, Brown Rudnick re-examined what Access had stated at summary judgment and realized its grave mistake by not using the $8 billion debt to win the case. Brown Rudnick, after losing the Preference Claim, even marked up Access's prior briefing with notes stating that Access's valuation of Lyondell "***plus $8 billion intercompany debt = insolvent***." This admission, and others like it, are fatal to any attempt by Brown Rudnick to claim that it provided competent, non-negligent representation to the Trust.

### c.     Brown Rudnick negligently conceded during trial that the presumption was rebutted.

54.     Brown Rudnick had another opportunity at trial to try to maintain the presumption of insolvency and thus establish Lyondell's insolvency as a matter of law. Brown Rudnick, however, negligently conceded that it was the Trust's burden to prove insolvency at trial. At the

very least, Brown Rudnick, failing to exercise due care, waived the argument that Access had to present trial evidence to rebut the presumption.[11]

55.     An attorney exercising the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession would not have agreed that the presumption of insolvency did not apply at trial. Instead, reasonably prudent counsel would have forced Access to attempt to introduce evidence to rebut the presumption of insolvency. Then, as described above, reasonably prudent counsel would have demonstrated why Access's evidence not only was wholly insufficient to rebut the presumption of insolvency, but actually conclusively proved that Lyondell was insolvent once the $8 billion debt was considered.

> **d.    Brown Rudnick's last-minute, post-trial effort to construct a valuation of Lyondell as a stand-alone entity was too little, too late.**

56.     Brown Rudnick's sole focus on the wrong debtor continued through trial where Brown Rudnick presented evidence concerning a valuation of LBI, not Lyondell. It was not until the very end of the trial that Brown Rudnick appears to have discovered, at least in part, the error in its approach of only presenting direct evidence of LBI's balance sheet as opposed to Lyondell's balance sheet. To try to correct what it now recognized as legal errors, Brown Rudnick made some futile attempts to fix the problem it created by using its ***post-trial*** submissions to argue, for the first time and without the relevant evidence, that Lyondell's insolvency was what mattered.

---

[11] *See In re Lyondell Chem. Co.*, 585 B.R. at 60 ("The Trustee not only failed to bring this alleged error to the attention of the bankruptcy court, but also affirmatively agreed that the defendants had no obligation to produce any evidence establishing solvency, necessarily implying that the statutory presumption had been vitiated. At no point after summary judgment did the Trustee ever argue that he was entitled to the statutory presumption, on either of the arguments that he makes now: (1) because the summary judgment record became irrelevant at trial, or (2) because the trial proof failed to match the summary judgment record. Given the clear waiver, and affirmative disclaimer, the Trustee cannot now complain that the bankruptcy court failed to provide the benefit of the statutory presumption.").

57.     The Bankruptcy Court rejected Brown Rudnick's belated post-trial effort to focus on Lyondell's stand-alone insolvency, stating:

> The Trustee did not argue that Lyondell (as opposed to LBI) was the relevant debtor for the preference claim *until his post-trial brief and closing arguments*. The Trustee's decision to switch focus from LBI to Lyondell forced the Trustee [in post-trial briefing and closing arguments] to extrapolate Lyondell's stand-alone financial condition from Maxwell's testimony regarding LBI's financial condition on a consolidated basis. . . .
>
> ***The Court will not extrapolate Lyondell's stand-alone insolvency*** based on Maxwell's unreliable testimony regarding LBI on a consolidated basis. ***It bears repeating that the Trustee changed course on this issue at the eleventh hour, after arguing for the entire trial that LBI was the relevant entity for this determination***.[12]

58.     An attorney exercising the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession would not have ignored the balance sheet of the debtor that actually made the preferential transfers. But this is what Brown Rudnick did. Had Brown Rudnick appropriately considered Lyondell's assets and liabilities on a stand-alone basis, it would have been a straightforward endeavor for the Trust to establish that Lyondell was balance-sheet insolvent when it made the preferential transfers to Access. This is true even with the loss of the presumption of insolvency.

59.     After Brown Rudnick's malpractice allowed the presumption of insolvency to be rebutted by Access, Brown Rudnick knew or should have known (much earlier than the end of the trial) that it was possible to, and that it should, value Lyondell's stand-alone assets for purposes of the trial.

60.     Specifically, as Brown Rudnick ultimately realized at the "eleventh hour," it was possible to use LBI's financial projections to arrive at a value for Lyondell because in its projections

---

[12] *In re Lyondell Chem. Co.*, 567 B.R. at 148–49 (emphasis added).

from 2007 and April 2008, LBI mostly broke out which portion of the financial projections pertained to Lyondell's business. Thus, the necessary evidence existed to calculate a valuation of Lyondell's assets.

61.     Brown Rudnick, apparently, eventually realized this sometime during the trial. Brown Rudnick first attempted to fix its failure to appropriately instruct Maxwell by trying to get Maxwell to testify to Lyondell's insolvency, despite Maxwell's never disclosing any opinion on Lyondell's value. But, because that opinion was not properly disclosed as required by Rule 26 and in accompanying expert reports, the Bankruptcy Court refused to allow any new opinions on Lyondell's stand-alone insolvency:

> Q.     *And is there any information in your reports and in the record documents that you believe would assist the Court in assessing the solvency of Lyondell Chemical Company on a stand-alone basis*?
>
> A.     The—the information to draw a conclusion in that regard is I believe contained in—is founded in the data that's included in my—my first report [which was a report valuing LBI as of December 2007, not the report purporting to value LBI as of October 2008].
>
> . . .
>
> The Court: Any of the opinions that you draw from PD-600 [a demonstrative exhibit] contained in any of your reports? Do you have the conclusions that you're presenting in PD-600 in any of your reports?
>
> Maxwell: I do not, Your Honor.
>
> The Court: *Objection sustained. . . . You're attempting to introduce an opinion that's not contained in any of his expert reports*. . . . So the objection is sustained.

62.     After the Bankruptcy Court blocked Maxwell from testifying on Lyondell's stand-alone insolvency, Brown Rudnick tried through its post-trial brief to cobble together its own, non-expert valuation of Lyondell despite conceding that "*Maxwell did not offer an opinion that Lyondell was insolvent on a stand-alone basis on October 20, 2008*." Of course, the **non-expert** valuation of Lyondell that Brown Rudnick provided in its **post-trial briefing** was basically the same

valuation that it tried to get Maxwell to describe at trial. The Bankruptcy Court had already rejected Brown Rudnick's untimely efforts to introduce evidence of Lyondell's stand-alone insolvency at trial because Brown Rudnick failed to provide the requisite expert disclosures. And Brown Rudnick's post-trial brief lacked the factual record and expert opinions necessary to establish Lyondell's stand-alone insolvency.

63.     Brown Rudnick's post-trial brief does, however, show that it could have timely presented expert and related testimony of Lyondell's insolvency had it correctly considered Lyondell's balance sheet and, as any reasonably prudent counsel would have done, asked Maxwell to provide an expert opinion on Lyondell's insolvency. In its post-trial brief, Brown Rudnick argued for the first time that, as of December 2007, Lyondell contributed between 66% and 73% of LBI's total EBITDA and, as such, Lyondell's stand-alone value as of December 20, 2007, was approximately $15.389 billion. Brown Rudnick tried to use this extrapolation from December 2007 to argue that Lyondell was insolvent in October 2008. Of course, because Brown Rudnick negligently failed to instruct Maxwell to provide a valuation of Lyondell, the Trust lacked the requisite expert analysis to show the fair value of Lyondell's assets.

64.     The Bankruptcy Court refused to consider Brown Rudnick's post-trial efforts to arrive at an estimated valuation of Lyondell, because Brown Rudnick's valuation was not supported by actual expert evidence or analysis and was not set out in the legally required pretrial disclosures. Thus, Brown Rudnick's negligence meant that the Trust had no expert witness who was qualified to testify as to Lyondell's stand-alone insolvency.

65.     Moreover, without actual evidence of the Intercompany Note or other debt instruments in the record, Brown Rudnick was also left with the difficult task of trying to prove the

existence of the $8 billion in debt through references to it in Lyondell's securities filings. For instance, in its post-trial brief, Brown Rudnick stated:

> Lyondell's liabilities include $8.0 billion in long-term debt on account of a December 20, 2007 related party note payable (the "Related Party Note") that Lyondell entered into with parent LBI. The $8.0 billion Related Party Note was on account of an intercompany loan that Lyondell had borrowed from its parent company. The origin of the Related Party Note is described in Lyondell's Form 10-Q for the period ended September 30, 2008.

66.     This secondhand reference was the full extent of Brown Rudnick's "evidence" of the $8 billion intercompany debt. (Even in its post-trial briefing, Brown Rudnick continued to misunderstand the Intercompany Note, including to whom the obligation was owed and how the note actually affected Lyondell's balance sheet. Brown Rudnick misunderstood the $8 billion debt because it never gathered the appropriate evidence, as any reasonably competent counsel would have done.)

67.     In closing arguments following post-trial briefing, the Bankruptcy Court clearly was interested in the $8 billion intercompany debt and its effect on Lyondell's balance sheet. But the Bankruptcy Court was also concerned that it could not consider the debt because the actual notes were not in evidence. In fact, the Bankruptcy Court appeared to believe there was not even a note, possibly because Brown Rudnick previously represented to the Bankruptcy Court that the note was "immaterial" and just part of LBI's overall consolidated cash management approach (which it was not). The following exchange between Brown Rudnick and the Bankruptcy Court illustrates the problems Brown Rudnick created:

> THE COURT: *It wasn't a note; it was—was it a—is there a note—*
>
> MR. POHL: Yes—
>
> THE COURT: —to the—
>
> MR. POHL: —there's a note. *I don't have the note*, but this says there's a— there is a—

THE COURT: (Indiscernible)

MR. POHL: Note payable, it's got an interest rate, it's got a maturity date; it exists, according to this publicly filed report.

68.     The Bankruptcy Court also expressed disbelief that Maxwell, as instructed by Brown Rudnick, never considered the intercompany debt (and Intercompany Note) in his valuation work:

> THE COURT: ***And did Mr. Maxwell, in his opinion on solvency, for October 2008, treat the eight-billion-dollar intercompany, the related party in debt, in his analysis?***
>
> MR. POHL: ***No, Your Honor***, because it's nonexistent in a consolidated.
>
>        . . .
>
> THE COURT: -- one more time. ***Did Mr. Maxwell consider, in his solvency analysis and the opinions that he rendered, the eight-billion-dollar intercompany debt that you point to, DX-390, as showing?*** I see it on the exhibit. But my question is whether Mr. Maxwell specifically took that into account in the opinion that he rendered with respect to October 2008 solvency.
>
> MR. POHL: ***No, he didn't, Your Honor***.

69.     Following closing arguments, in a last-ditch effort to try to rectify its clear failure to identify the massive debt earlier, Brown Rudnick submitted an unsolicited letter to the Bankruptcy Court in which it again focused on the relevance of the $8 billion intercompany debt to the insolvency issue.

70.     The fact that Brown Rudnick submitted an additional post-trial letter brief to the Bankruptcy Court to reiterate its belated arguments about Lyondell's massive liability illustrates the critical importance of the Intercompany Note to the solvency question. The post-trial submissions also directly prove that Brown Rudnick's prior incorrect description of the Intercompany Note as "immaterial" constitutes negligence.

71.     Access, of course, responded to the post-trial letter by emphasizing that Brown Rudnick never presented a stand-alone valuation of Lyondell and never introduced the debt instruments into evidence:

*Leading up to and throughout the trial, [the Trustee] never proffered a stand-alone valuation of Lyondell,* and therefore never had a basis to compare Lyondell's stand-alone value to Lyondell's liabilities, fairly valued. . . . *In fact, in his pre-trial fact contentions, the Trustee never even alleged that Lyondell was insolvent in October 2008,* but rather that "LBI, considered on a consolidated basis with its subsidiaries" was insolvent upon the closing of the Merger and at all times thereafter. After the trial, the Trustee has shifted his approach so that he now argues that Lyondell could have been insolvent even if LBI was solvent. But this *new hypothesis was not the subject of the trial or of the Trustee's expert opinion on insolvency* . . . .

At closing, the Trustee raised an intercompany note that was footnote-referenced in the financial statements, *but was never in evidence* so that its terms could be evaluated, and that was not a scheduled liability of Lyondell when it filed for bankruptcy. . . . *Indeed, on summary judgment, the Trustee characterized the very same intercompany note as just part of LBI's overall consolidated cash management approach and explicitly stated it was "immaterial" to solvency.* (Emphasis added.)

72.     And, as demonstrated by the Bankruptcy Court's opinion ruling against the Trust, the court did not consider the debt because, among other reasons, the debt was not mentioned in any expert opinion and Brown Rudnick never introduced the debt instruments into evidence.

73.     Brown Rudnick's post-trial submissions prove that the failure to introduce the Intercompany Note into evidence or otherwise establish the existence of the $8 billion debt crippled the Trust's ability to establish Lyondell's insolvency. If Brown Rudnick had conducted a proper, or even a cursory, review of the evidence as part of its preparation of the case, as prudent counsel would have done, Brown Rudnick would have discovered direct evidence of the Intercompany Note.

74.     If the Intercompany Note and other intercompany debt of approximately $800 million had been added as liabilities to Lyondell's balance sheet, then Lyondell would have reported total liabilities well in excess of the value of its assets.

75.     In sum, had Brown Rudnick properly instructed an expert to value Lyondell, it is evident that an expert could have arrived at an opinion on the value of Lyondell's assets. And even

a conservative valuation of Lyondell's assets would have demonstrated that Lyondell was insolvent because Lyondell owed massive intercompany liabilities, including the Intercompany Note. Failing to present an expert to testify as to the stand-alone solvency of Lyondell and failing to identify the additional $8 billion debt of Lyondell—an undisputedly material piece of evidence—were not strategic decisions by Brown Rudnick. Rather, these were critical legal mistakes by Brown Rudnick that no attorney exercising the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession would have made. Brown Rudnick's mistakes caused the Trust to lose the Preference Claim.

### e.    Brown Rudnick conceded that it negligently failed to analyze Lyondell's insolvency.

76.    As further described herein, Brown Rudnick, on behalf of the Trust, appealed the loss of the Preference Claim to the U.S. District Court for the Southern District of New York (the "**District Court**"). To assist with the appeal, the Trust retained Kellogg, Hansen, Todd, Figel & Frederick PLLC ("**Kellogg Hansen**") to act as appellate counsel.

77.    Prior to commencing this action, the Trust, through Mr. Holliday, requested that Kellogg Hansen turn over the Trust's client file concerning Kellogg Hansen's representation. Kellogg Hansen quickly responded to this request and produced both electronic and hard-copy documents to the Trust. Brown Rudnick, however, as explained further below, has refused to produce the Trust's client file to the Trust. Accordingly, the communications cited herein are solely those that the Trust obtained from Kellogg Hansen.

78.    In correspondence with Kellogg Hansen, Brown Rudnick admitted that the Trust could and would have won the affirmative case at summary judgment had Brown Rudnick simply used the Intercompany Note. In fact, several Brown Rudnick partners lamented the firm's failure to *timely* identify the $8 billion in debt to the Bankruptcy Court.

79.     In various correspondence and notes with Kellogg Hansen concerning the appeal of the Preference Claim, multiple Brown Rudnick partners recognized that had Brown Rudnick used the debt at summary judgment, the Trust would have won the case. These partners stated, among other things:

- "*[T]he computations that Access presented [at summary judgment] were carried out without reference to the $8bb intercompany claim*." (Emphasis added.)

- "*The computations done to show LYO [Lyondell] was insolvent, even on the best case (to be confirmed), would fail and show insolvency once the $8bb IC claim is added*." (Emphasis added.)

- "Quinn [counsel to Access] comes up with a best case for LCC [Lyondell] standalone and how much 'solvency' cushion there is all of that was done excluding the $8bb - which, if included, I think absorbs all the cushion."

- "*[N]otion that if LBI is solvent, LCC must be too—wrong based on 8 bb*!!" (Emphasis added.)

- "[W]ith record evidence of LCC standalone debt of over 21bb, *this evidence supports it not being a close call for LCC*." (Emphasis added.)

- "Issues of [Lyondell's] share of contingent liabilities are not germane one [sic] you add in the 8BB interco."

80.     Unfortunately for the Trust and its beneficiaries, Brown Rudnick's realization about the importance of the $8 billion debt to the case was, as one Brown Rudnick partner put it to Kellogg Hansen, "*too little, too late*." By the time Brown Rudnick finally understood the case, the Trust had already lost the presumption of insolvency and conducted the entire trial without presenting direct evidence of Lyondell's assets and liabilities.

81.     Brown Rudnick's candid assessments in correspondence with appellate co-counsel reveal Brown Rudnick's recognition of its own malpractice. The Trust expects that Brown Rudnick's internal communications contain similar admissions of liability. As indicated above, Brown Rudnick, however, has refused to hand over the client file on the basis that the Trust, which itself was formed out of Lyondell's bankruptcy for the benefit of its creditors, must first pay Brown

Rudnick an exorbitant sum of money to access its records. (Of course, the likely reason for Brown Rudnick's refusal to turn over the client file is that the firm simply does not want to turn over its damaging documents.)

> **2.      Brown Rudnick's valuation of LBI was based on a legally unsupportable approach.**
>
> > **a.      Brown Rudnick relied on December 2008 LBI projections without a factual or legal basis to do so.**

82.     Brown Rudnick's second, and equally fatal mistake, was relying on LBI's long-term projections as of December 2008 (the "**December 2008 projections**") to prove that LBI was insolvent months earlier, in October 2008.[13] Brown Rudnick knew or should have known that, as a matter of well-established bankruptcy law, the Trust could not credibly use the December 2008 projections to prove that Lyondell was insolvent in October 2008. Brown Rudnick's ignorance or disregard of relevant caselaw caused the Trust to lose the Preference Claim.

83.     Numerous bankruptcy courts have recognized that "insolvency at a given point in time is often difficult to demonstrate by direct proof." Accordingly, courts permit trustees to introduce evidence of the debtor's financial condition either before or after the date of the alleged avoidable transfer to demonstrate the debtor's insolvency as of the date of the transfer. But, as Brown Rudnick knew or should have known, the caselaw is clear that a trustee may rely on evidence of insolvency from other dates only so long as the debtor's financial condition did not materially change in the interim.[14] For instance, in *In re Jesup & Lamont, Inc.*, the court held: "If a trustee

---

[13] The negligent decision to use the December 2008 projections also created other unnecessary problems for the case. *See In re Lyondell Chem. Co.*, 567 B.R. at 106 (noting issue with the tax rate Maxwell used because it was different from LBI's cash tax rate as set forth in the December 2008 projections).

[14] *See, e.g.*, *In re TC Liquidations LLC*, 463 B.R. 257, 275 (Bankr. E.D.N.Y. 2011) ("The party seeking to use retrojection, here Trustee, must establish (1) the absence of any books and records that would assist him, or his expert, in ascertaining the debtor's financial condition, and (2) the absence of any radical or substantial change in the debtor's assets or liabilities between the retrojection dates."); *In re Prime Realty, Inc.*, 380 B.R. 529, 535 (B.A.P. 8th Cir. 2007); *In re Crawford*, 454 B.R. 262, 273 (Bankr. D. Mass. 2011).

shows that the debtor was insolvent at a time subsequent to the date of the alleged fraudulent transfer, *the trustee must also show that the debtors' financial condition did not change during the interim period*."[15]

84.     It was Brown Rudnick's duty to instruct the Trust's expert on the law, including the use of any "retrojection" analysis. Brown Rudnick, however, failed to do so.

85.     Moreover, as a factual matter, it was obvious that LBI's (and Lyondell's) financial condition materially deteriorated between October 2008 and December 2008, as did nearly every other company in the United States. There was no evidence suggesting otherwise. In fact, even Maxwell acknowledged at trial that the Great Recession caused a dramatic decline in LBI's performance in November and December 2008.

86.     Access, capitalizing on Brown Rudnick's errors on the law and facts, repeatedly emphasized throughout the case that "[a]ny effort to use projections of LBI's prospects in late December 2008 or January 2009 fails to account for significant intervening events impacting LBI's business operations in November and December." Moreover, following trial, Access again reiterated that use of the December 2008 projections was inappropriate as a matter of law, stating: "Maxwell's use of December 2008 projections is improper and unreliable, both as a matter of fact and law."

87.     The Bankruptcy Court agreed, ruling: "Maxwell's use of the 2008 LRP Projections, which were not finalized and presented until December 2008, *is unpersuasive* as to LBI's financial condition two months earlier in mid-October 2008, in light of the substantial deterioration in LBI's financial performance thereafter."[16]

---

[15] *In re Jesup & Lamont, Inc.*, 507 B.R. at 473 (emphasis added).

[16] *In re Lyondell Chem. Co.*, 567 B.R. at 105 (emphasis added).

88.     Maxwell tried to overcome the issue by stating, in his expert report, that the December 2008 projections were "developed during the 2nd half of 2008 and available in October." But Brown Rudnick knew or should have known that there was no reasonable basis for this conclusion.

89.     Reasonably prudent counsel would not have presented a case knowing that it lacked factual support. Moreover, reasonably prudent counsel would not present an expert opinion that it knew was based on non-existent facts; but this is precisely what Brown Rudnick did.

90.     The Bankruptcy Court chided Brown Rudnick for essentially trying to create evidence:

> Maxwell assumed that the December 2008 projections must have been fully drafted by mid-October 2008—despite failing to identify a single draft before December. Maxwell further assumed that even if projections were drafted in October, those projections would not have been updated by December. *The Court finds that it strains credulity to believe that LBI would have fully drafted its projections in October (without producing any record of such drafts), watched the Great Recession begin to unfold all around it, discussed in December the dramatic decline of its business, and yet used the exact same numbers it drafted in October without a single change to reflect the economic decline of the last two months*.[17]

91.     Because Brown Rudnick did not introduce any evidence concerning the value of either LBI or Lyondell in or prior to October 2008, the Bankruptcy Court held that it lacked any basis to find that Lyondell was insolvent when it made the transfers to Access.

      **b.     Brown Rudnick could have presented compelling evidence to prove that Lyondell was insolvent in October 2008.**

92.     Brown Rudnick's approach to proving Lyondell's insolvency made little sense given that, as Brown Rudnick knew or should have known, there were projections from earlier in 2008 that proved that Lyondell was insolvent and remained insolvent in October 2008.

---

[17] *Id.* at 65 (emphasis added).

93.     Specifically, Brown Rudnick knew or should have known, prior to submitting an expert report, that the evidence showed that the most recent long-term projections that Lyondell had at the time of the October 2008 transfers were projections created in April 2008 (the "**April 2008 projections**"). Had Brown Rudnick appropriately advised Maxwell on the facts and the applicable law governing the use of projections in insolvency analysis, Brown Rudnick and Maxwell could have used the April 2008 projections to demonstrate that Lyondell was insolvent.

94.     Critically, even employing a conservative analysis based on the April 2008 projections, it is clear Lyondell was insolvent in April 2008. And because there was no dispute that Lyondell's condition worsened between April 2008 and October 2008, it would have been straightforward to establish that Lyondell was insolvent in October 2008. Having established that Lyondell was insolvent in April 2008, Brown Rudnick then could have used the December 2008 projections to buttress its argument that Lyondell remained insolvent through October 2008.

95.     Brown Rudnick's failure to use the April 2008 projections—which the evidence clearly established were the most current projections as of the date of the preferential transfers to Access—was a breach of the standard of care. And, as stated above, Lyondell's insolvency could have easily been proven using these same projections. Thus, because the Bankruptcy Court found that all elements of the preference claim were established except for insolvency, Brown Rudnick's failure to use the correct dates for the insolvency analysis caused the Trust to lose the $300 million Preference Claim.

**D.     Brown Rudnick Compounded Its Negligence by Concealing Its Malpractice from the Trust Advisory Board.**

96.     Brown Rudnick recently has taken the position that the Trust could have settled the claims against Access and other defendants (which included claims for fraudulent transfer that Brown Rudnick also ultimately lost before the Bankruptcy Court) in late 2016 or early 2017. But it

was Brown Rudnick's active concealment of its own negligence that caused the Trust to lose the settlement opportunity.

97.     The Trust was engaged in settlement discussions with the defendants prior to trial, during the trial, and after the trial. The Preference Claim would have had substantial settlement value if Brown Rudnick had prosecuted the claim as reasonably prudent counsel would have done. But even after Brown Rudnick's negligent prosecution of the Preference Claim, the overall case against Access and other defendants had settlement value, and the defendants were willing to pay substantial money to settle the pending claims.

98.     A meaningful settlement could and would have been reached had Brown Rudnick advised the Trust, including the Trust Advisory Board, that Brown Rudnick had botched the Preference Claim and that, as a result, a realistic settlement value must account for Brown Rudnick's negligent mistakes.

99.     Brown Rudnick, of course, never advised the Trust Advisory Board that the firm had committed malpractice and negligently prosecuted the Preference Claim. Weisfelner also did not disclose to the Trust Advisory Board that his own partners committed malpractice. Rather, ignoring its own negligence, Brown Rudnick advised the Trust that the Preference Claim had a good prospect of success.

100.    Because there was an opportunity to settle the Preference Claim (as part of an overall resolution of the claims against Access)—and thus mitigate, to some extent, the damage caused by Brown Rudnick's malpractice—Brown Rudnick owed a fiduciary duty to the Trust to provide it with prudent advice concerning the settlement. Specifically, to protect the interests of the Trust (Brown Rudnick's client), Brown Rudnick had to disclose to the Trust Advisory Board, among other things, that the firm: negligently failed to timely introduce the evidence necessary to maintain

the presumption of insolvency; negligently failed to have an expert opinion (as set forth in the legally required disclosures) on Lyondell's stand-alone insolvency; and negligently ignored the law on how to perform a retrojection analysis.

101.    Brown Rudnick, however, did not provide the Trust Advisory Board a candid assessment that the Trust would lose the Preference Claims due to Brown Rudnick's negligence. Because Brown Rudnick never revealed its own errors, the Trust Advisory Board was never able to properly evaluate and take advantage of the overall potential settlement opportunity. Weisfelner, likewise, did not disclose the negligence of his partners to the Trust Advisory Board because he had a conflict of interest. In short, Brown Rudnick put its interest ahead of those of the Trust.

102.    Had Brown Rudnick provided the Trust with honest and prudent advice in late 2016 and early 2017, the Trust, with the approval of the Trust Advisory Board, could have settled the claims against Access and others for substantial value.

**E.    Brown Rudnick Appealed to the District Court, But Without Evidence of Lyondell's Insolvency in the Record, the District Court Affirmed.**

103.    Brown Rudnick, on behalf of the Trust, appealed the case to the District Court. That court, in a January 24, 2018 opinion, affirmed the Bankruptcy Court's ruling.

104.    Contrary to its position in the Bankruptcy Court, Brown Rudnick's primary argument on appeal was that Access had the burden to rebut the presumption of insolvency during trial. The District Court easily rejected this argument because Brown Rudnick "not only failed to bring this alleged error to the attention of the bankruptcy court, but also affirmatively agreed that the defendants had no obligation to produce any evidence establishing solvency, necessarily

implying that the statutory presumption had been vitiated."[18] The District Court's finding of waiver

is but further evidence of Brown Rudnick's numerous mistakes in its prosecution of the case.

105.    With respect to the issue of insolvency, the District Court, like the Bankruptcy Court,

began its opinion by finding that Brown Rudnick considered the wrong debtor in its insolvency

analysis, stating:

> *In post-trial briefing, the Trustee contended that Lyondell was the appropriate debtor for this claim, and the bankruptcy court agreed. Nonetheless, Anders Maxwell's testimony focused entirely on LBI. He expressed no opinion whatsoever on the valuation of Lyondell as a stand-alone entity.* Only in post-trial briefing was an attempt made to extrapolate the valuation Maxwell provided for LBI to a valuation of Lyondell, without any testimony to support the Trustee's methodology. Although not dispositive of the Trustee's claims here, it does limit the extent to which any errors, even if found, could be deemed reversible.[19]

106.    The District Court then agreed with the Bankruptcy Court's conclusion that

Maxwell's testimony was "***seriously flawed***," with the "***most troubling***" part being "Maxwell's

reliance on projections first presented to LBI's board in December 2008 to value LBI as of October

2008."[20] Thus, the District Court agreed that Brown Rudnick had used the wrong date for the

solvency analysis.

107.    Finally, the District Court turned to Brown Rudnick's purported "non-expert

evidence" of Lyondell's stand-alone insolvency. On appeal, Brown Rudnick barely mentioned the

Intercompany Note or the $8 billion debt. In fact, this is the extent of what it said about Lyondell's

liabilities in its appellate brief: "LBI was also not a co-obligor or co-guarantor for much of

---

[18] *In re Lyondell Chem. Co.*, 585 B.R. at 60 ("At no point after summary judgment did the Trustee ever argue that he was entitled to the statutory presumption, on either of the arguments that he makes now: (1) because the summary judgment record became irrelevant at trial, or (2) because the trial proof failed to match the summary judgment record. Given the clear waiver, and affirmative disclaimer, the Trustee cannot now complain that the bankruptcy court failed to provide the benefit of the statutory presumption.").

[19] *Id.* at 61 (emphasis added).

[20] *Id.* at 62 (emphasis added).

Lyondell's debt. *E.g.*, A2600 ($8 billion note from Lyondell to LBI)." Brown Rudnick's appeal further shows that it never introduced direct evidence of Lyondell's insolvency at trial.

108.    The non-expert evidence that Brown Rudnick did mention on appeal was a 2008 Lyondell 10-Q, which noted that the "book value" of Lyondell's liabilities exceeded the "book value" of Lyondell's assets. The District Court outright rejected this evidence as legally and factually insufficient to show Lyondell's insolvency because, under well-established law, "the balance-sheet insolvency inquiry is 'fair value,' the value that a purchaser in the marketplace would ascribe to the asset or liability, not 'book value.'"[21]

109.    The District Court concluded by reiterating that Brown Rudnick "altogether failed" to show Lyondell's insolvency.[22] And then, the District Court remarked that it did not find this failure "surprising" given Brown Rudnick's incorrect focus "on proving the insolvency of LBI rather than Lyondell on a stand-alone basis."[23]

**F.    Brown Rudnick's Negligence Caused the Trust to Lose $300 Million.**

**1.    The Trust would have proven each element of its claim.**

110.    Brown Rudnick failed to prosecute the Preference Claim in a reasonable manner. As fully explained above, Brown Rudnick analyzed the wrong debtor and the wrong date for the insolvency analysis. But for Brown Rudnick's failures, Access would not have rebutted the presumption of insolvency. If the presumption was intact, as it should have been, the Trust would have prevailed on each element of the Preference Claim.

111.    Even without the presumption of insolvency, but for Brown Rudnick's negligence, at trial the Trust could have used actual, pre-existing evidence to prove Lyondell's stand-alone

---

[21] *Id.* at 63.

[22] *Id.* at 64.

[23] *Id.*

insolvency on the date of the preferential transfers. That is, the weight of the evidence clearly demonstrated that Lyondell was insolvent, and all the Trust needed was competent counsel to present an expert report in accordance with the Federal Rules of Civil Procedure and the deadlines set in the case showing, in the words of Brown Rudnick, that insolvency was not even a "close call."

112.    In sum, but for Brown Rudnick's malpractice as described above, the Trust could and would have proven each element of the preference claim and would have prevailed in the Preference Claim, either on summary judgment or at trial. Brown Rudnick's negligence caused the Trust to lose the $300 million claim.

### 2.    Access would not have prevailed on its affirmative defenses.

113.    Access's affirmative defenses lacked merit, and the Trust would have prevailed on the Preference Claim.[24]

114.    To establish the so-called "ordinary course" defense, § 547(c)(2) of the Bankruptcy Code requires the transferee to prove that the debt (1) was incurred "in the ordinary course of business or financial affairs of the debtor and the transferee" and (2) was repaid "in the ordinary course of business or financial affairs of the debtor and the transferee" or pursuant to ordinary business terms.

115.    Here, the essence of Access's affirmative defense was that the Access Revolver—a loan agreement between Lyondell and it, as Lyondell's indirect owner—was "ordinary" for both parties. There was little to no support, however, for Access's argument that it commonly provided

---

[24] Access moved for summary judgment on its affirmative defense under § 547(c)(2) of the Bankruptcy Code. The Bankruptcy Court denied Access's motion for summary judgment, finding that there were fact issues for trial. The Bankruptcy Court ultimately did not address Access's affirmative defense because it found that the Trust had failed to prove that Lyondell was insolvent. As explained herein, had the Bankruptcy Court needed to consider Access's affirmative defense, it would have concluded that Access failed to satisfy its burden at trial.

loans. In fact, aside from simply saying so at trial, Access did not provide direct evidence that it commonly provided documented loans to its affiliates prior to the October 2008 draw.

116.    Access's defense also was legally not supportable. The § 547(c)(2) defense does not protect short-term cash infusions to address a capitalization crunch, particularly when the cash infusion is a first-time transaction between two affiliated entities. Given this law and the undisputed facts concerning Access's prior business practices, Access did not establish the affirmative defense at trial by a preponderance of the evidence.

117.    Lyondell's repayment of the loan also was neither in the ordinary course nor pursuant to ordinary business terms. The Access Revolver was the only unsecured revolving credit facility available to Lyondell, and Lyondell never drew on the Access Revolver until October 2008. Thus, there was no relevant payment history for Access to show that the loan repayments were made "in the ordinary course of business or financial affairs of the debtor and the transferee." Further, it is well-established that a quick payment to a creditor is a quintessential preference payment, and Lyondell repaid the loan within a matter of days. Finally, the fact that Access refused to fund another draw on the Access Revolver in December shows that the quick repayment in October 2008 was an atypical transaction.

118.    At bottom, the repayment of the Access Revolver had the hallmarks of a preference payment—Access quickly received all of its money back prior to Lyondell's bankruptcy filing and refused to provide further cash infusions, whereas other unsecured creditors were left holding the proverbial bag.

119.    In its post-trial brief, Brown Rudnick summarily dismissed the merits of Access's affirmative defense, stating: "For years, Access's primary defense to this claim has been that this was nothing more than an 'ordinary course' transaction, protected by the Section 547(c)(2) ordinary

course defense. That defense has not survived trial. ***On any credible view of the record, Access no longer can prove that the debt was incurred in the ordinary course***." (Emphasis added).[25]

### G. The Trust Advisory Board, After Investigating Brown Rudnick's Conduct, Removed Weisfelner as Trustee.

120.    On July 31, 2018, the Trust Advisory Board received a letter from a Trust beneficiary who held a large position in the Trust notifying the Trust Advisory Board that the beneficiary believed the Trust had malpractice claims against Brown Rudnick. The Trust beneficiary made an initial offer to purchase the Trust's malpractice claims for $5 million and requested that the Trust Advisory Board act to either sell the claim or ensure its pursuit on behalf of the Trust. The letter stated in pertinent part:

> This offer is being communicated directly to the Board because Edward Weisfelner, the Trustee, has a direct conflict in this proposed transaction (which includes potential claims against Brown Rudnick LLP) due to his status as a partner of Brown Rudnick LLP.
>
> . . .
>
> In the event that the Board declines our offer or declines to consider our offer, we, as beneficiaries of the LB Litigation Trust, ***demand that the Board comply with its fiduciary duties by appointing an independent trustee—either to replace Mr. Weisfelner as trustee or to serve as special litigation trustee—to evaluate and prosecute any Third Party Claims***. The Purchasers are prepared to provide litigation funding for the Third Party Claims on commercially reasonable terms to be negotiated with the Board and the independent trustee so that the prosecution of the Third Party Claims does not require any expenditure by the LB Litigation Trust. (Emphasis added.)

121.    In response to the letter, the Trust Advisory Board retained counsel, including the independent advice of a retired bankruptcy judge, Judge Leif M. Clark, to assess the merits of the Trust's claim against Brown Rudnick. The Trust Advisory Board then determined that the Trust

---

[25] It is Brown Rudnick's burden in this action to prove that Access would have prevailed on its affirmative defense. Brown Rudnick cannot meet that burden.

had meritorious claims against Brown Rudnick, and thus removed and replaced Weisfelner as trustee.

**H.     Brown Rudnick Has Refused to Produce the Client File, and Weisfelner Has Not Turned Over Any Documents to the Successor Trustee.**

122.    After Weisfelner's removal, Holliday, as successor Trustee, requested that Brown Rudnick turn over the Trust's client file. Brown Rudnick, however, refused on the basis that the Trust should pay Brown Rudnick an exorbitant sum to review the documents for privilege and relevance and produce them to the Trust.

123.    The Trust offered to pay Brown Rudnick $25,000 for the production of the file and specifically explained to Brown Rudnick that it should not cost the firm anything to turn over the electronic documents (*e.g.*, pleadings, memoranda) saved on Brown Rudnick's document management system for the Preference Claim. The Trust further explained that, to the extent that Brown Rudnick haphazardly saved electronic documents relevant to the Preference Claim and thus needed to review the file prior to turning it over to Trust, Brown Rudnick should have to incur the time and expense to do so, not the Trust. Brown Rudnick, however, refused to produce a single document.[26]

124.    Holliday also requested that Weisfelner, as former Trustee, produce certain documents to the Trust. Weisfelner, like Brown Rudnick, has refused to turn over documents.[27]

---

[26] As noted above, the Trust's appellate counsel, Kellogg Hansen, responded to the Trust's request for its client file without objection.

[27] Weisfelner, while Trustee (*i.e.*, before he was removed), communicated with Brown Rudnick about the Trust's malpractice claims against Brown Rudnick. But he has not produced those communications. Furthermore, on information and belief, Weisfelner, while Trustee, also communicated with Latham & Watkins about Brown Rudnick's alleged negligence. Weisfelner has not produced these communications either.

125.     Notably, Weisfelner, despite his clear conflict of interests, previously asserted that he determined the claims against his law firm lacked merit. Weisfelner, however, has not produced any documents to the successor Trustee concerning the alleged investigation into Brown Rudnick's malpractice that he undertook.

126.     Rather than cooperate with the Trust Advisory Board and successor Trustee, Weisfelner threatened utterly meritless claims against the Trust and members of the Trust Advisory Board if the Trust Advisory Board took actions to remove him and pursue the Trust's malpractice claims against Brown Rudnick. These threats of frivolous claims demonstrate that Weisfelner was looking out for the interest of his law firm rather than the interest of the Trust and its beneficiaries.

## V.     DEMAND FOR JURY

127.     Plaintiff demands a jury trial on all issues.

## VI.     CLAIMS FOR RELIEF

### Count I: Legal Malpractice / Professional Negligence

### (Loss of the $300 Million Preference Claim)

128.     Plaintiff repeats and re-alleges the allegations set forth above.

129.     Brown Rudnick had an attorney–client relationship with the Trust.

130.     As counsel to the Trust, Brown Rudnick owed the Trust a duty to exercise reasonable and professional care consistent with the standard of care that is expected to be exercised by counsel in providing legal services. Brown Rudnick, however, did not exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession.

131.     As described in detail above, Brown Rudnick breached the standard of care when it, among other things, negligently failed to: understand how to prosecute a preference claim without creating wholly unnecessary hurdles for its client to overcome; gather and understand the evidence concerning Lyondell's balance sheet; properly instruct the Trust's expert to value the correct debtor

(Lyondell); introduce specific evidence of Lyondell's assets during the case; introduce evidence of Lyondell's liabilities, including the Intercompany Note and related intercompany liabilities, during the case; and apply established legal principles to its prosecution of the Preference Claim, including those principles governing how to use financial projections in an insolvency analyses. As fully described in this complaint, Brown Rudnick, through its unreasonable and negligent conduct, failed to prove the elements of the Trust's Preference Claim against Access.

132.   More specifically, as set forth above, Brown Rudnick failed to gather and present evidence that Lyondell, as opposed to LBI, was balance-sheet insolvent in October 2008. Brown Rudnick failed to secure an expert witness to testify about Lyondell's stand-alone insolvency. Brown Rudnick also failed to timely present admissible evidence of $8 billion in intercompany debt that clearly rendered Lyondell balance-sheet insolvent. Instead of using the intercompany debt to maintain the presumption of insolvency, Brown Rudnick ignored the debt and even described it as immaterial.

133.   Further, as also explained above, Brown Rudnick failed to gather and present evidence of Lyondell's financial condition on the dates of the transfers in mid-October 2008, relying instead on December 2008 projections with insufficient explanation of the changed economic environment and the intervening changes in Lyondell's assets and liabilities.

134.   But for Brown Rudnick's negligence, the Trust could and would have retained the presumption of insolvency (whether at summary judgment or trial) and, even if the presumption was somehow rebutted, proved insolvency at trial. But for Brown Rudnick's negligence, the Trust would have prevailed against Access in the Preference Claim.

135.   Because of Brown Rudnick's failure to win the insolvency issue at summary judgment, the Trust needlessly had to pay Brown Rudnick and Maxwell to litigate that issue at trial.

136.     More importantly, as a direct and proximate result of Brown Rudnick's malpractice, the Trust lost $300 million, plus interest, that would have been awarded on the Preference Claim.

137.     In sum, as a direct and proximate result of Brown Rudnick's negligence, the Trust suffered more than $300 million in damages.

### Count II: Legal Malpractice / Professional Negligence
### (Lost Settlement Value)

138.     Plaintiff repeats and re-alleges the allegations set forth above.

139.     Brown Rudnick had an attorney–client relationship with the Trust.

140.     As counsel to the Trust, Brown Rudnick owed the Trust a duty to exercise reasonable and professional care consistent with the standard of care that is expected to be exercised by counsel in providing legal services. Brown Rudnick, however, did not exercise ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession.

141.     Brown Rudnick breached the standard of care when it, among other things, negligently failed to appropriately advise the Trust in late 2016 and early 2017 about the merits of the Preference Claim in light of Brown Rudnick's evidentiary failings. Concealing its own negligence, Brown Rudnick negligently or intentionally mislead the Trust Advisory Board about the Trust's likelihood of success.

142.     As a direct and proximate result of Brown Rudnick's professional negligence, the Trust lost the settlement value of the claims against Access (as they existed after Brown Rudnick's negligence), in an amount to be proven at trial.

### Count III: Breach of Fiduciary Duty

143.     Plaintiff repeats and re-alleges the allegations set forth above.

144.     Brown Rudnick had an attorney–client relationship with the Trust.

145.     As counsel to the Trust, Brown Rudnick owed the Trust a fiduciary duty.

146.     Brown Rudnick breached this fiduciary duty by failing to provide the Trust with its client file—*e.g.*, pleadings, memoranda, correspondence concerning the Preference Claim. Notably, although there should have been no cost to copy and transfer those documents saved on Brown Rudnick's electronic management system, Brown Rudnick refused to produce those documents, claiming that such a production would be "unduly burdensome." If Brown Rudnick does not have a system to save pleadings (including drafts thereof), memoranda, and correspondence with respect to a certain case in an organized manner, then Brown Rudnick, not its client, must bear that cost.

147.     In sum, Brown Rudnick refused to turn over a single document in response to Holliday's request on the basis that the Trust should pay Brown Rudnick hundreds of thousands of dollars for the file.

148.     Accordingly, Plaintiff requests that Brown Rudnick be found to have breached its fiduciary duties and award Plaintiff damages in an amount to be proven at trial.

## VII.    PRAYER FOR RELIEF

149.     WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor for the following:

a.     Actual and compensatory damages, including, without limitation, damages equal to the value of the Preference Claim, including pre-judgment interest that would have applied to the Preference Claim;

b.     A judgment that Brown Rudnick breached its fiduciary duties;

c.     Pre- and post-award interest at the highest rate and amount authorized by applicable law;

d.     An award of costs related to this proceeding, including attorneys' fees; and

e.     Such other and further relief at law or in equity as the Court deems just and appropriate.

Dated:  February 5, 2020                     REID COLLINS & TSAI LLP


                                     */s/ William T. Reid, IV*
                                     William T. Reid, IV
                                     wreid@rctlegal.com
                                     Marc Dworsky
                                     mdworsky@rctlegal.com
                                     810 Seventh Avenue, Suite 410
                                     New York, New York
                                     212-344-5200

                                     Joshua J. Bruckerhoff (*pro hac vice*)
                                     jbruckerhoff@rctlegal.com
                                     Barbara Whiten Balliette (*pro hac vice*)
                                     bballiette@rctlegal.com
                                     1301 S. Capital of Texas, C-300
                                     Austin, Texas 78746
                                     512-647-6100

                                     *Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on February 5, 2020, the foregoing document was filed using the

CM/ECF system, which will send notice of electronic filing to all counsel of record.


By:  _/s/ William T. Reid, IV_____
William T. Reid, IV