UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARK E. HOLLIDAY, *as Trustee of the LB Litigation Trust*,

                                        Plaintiff,

                    -v-

BROWN RUDNICK LLP,

                                        Defendant.

19 Civ. 10925 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

Plaintiff Mark E. Holliday, trustee of the LB Litigation Trust (the "Trust") brings this action for legal malpractice against defendant Brown Rudnick LLP ("Brown Rudnick"). Brown Rudnick represented the Trust in *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, Adv. Pro. No. 09-1375 (Bankr. S.D.N.Y.), before the Bankruptcy Court for the Southern District of New York, in which the Trust lost a $300 million preference claim (the "Preference Claim") to Access Industries Holdings, LLC ("Access"). Holliday alleges that this loss was due to Brown Rudnick's negligence. He accordingly brings claims against the firm under New York state law for legal malpractice for loss of the Preference Claim, legal malpractice for lost settlement value, and breach of fiduciary duty.

Brown Rudnick moves to dismiss the Amended Complaint ("AC"). For the reasons that follow, the Court grants that motion in part and denies it in part. The Court sustains Holliday's claim of legal malpractice for loss of the Preference Claim but grants the motion as to the two other claims.

I.    **Background**[1]

   A.    **The Parties**

Plaintiff Holliday is the trustee of the Trust.  AC ¶¶ 18, 23.  He was appointed to succeed

Edward Weisfelner, a Brown Rudnick partner, as trustee following Weisfelner's removal.  *See*

*id.* ¶¶ 15, 23.

Defendant Brown Rudnick is the law firm that represented the Trust in the underlying

bankruptcy case, including the Preference Claim litigation.  *See id.* at 1 & ¶ 1.  It has an office in

New York, New York.  *Id.* ¶ 24.

Non-party Lyondell Chemical Co. ("Lyondell") was a debtor in the underlying

bankruptcy case.  *Id.* ¶ 1.  Lyondell's holding company was LyondellBasell Industries AF S.C.A.

("LBI").  *Id.* ¶ 7.  The Trust was created in connection with Lyondell and LBI's filing for

bankruptcy under Chapter 11.  *See id.* ¶¶ 22, 29.

---

[1] This account is drawn primarily from the Amended Complaint.  Dkt. 24 ("AC").  For the
purposes of resolving Brown Rudnick's motion to dismiss, the Court accepts all factual
allegations in the AC as true, drawing all reasonable inferences in Holliday's favor.  *See Koch v.
Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

In resolving a motion to dismiss, courts may consider documents attached to the complaint, those
incorporated by reference into the complaint, and those that are "integral" to the complaint, *i.e.*,
those that the complaint "relies heavily" on for their "terms and effect."  *See DiFolco v. MSNBC
Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (citation omitted).  Courts "may also take judicial
notice of filings made in another court 'not for the truth of the matters asserted in the other
litigation, but rather to establish the fact of such litigation and related filings.'"  *Holland v.
JPMorgan Chase Bank, N.A.*, No. 19 Civ. 233 (PAE), 2019 WL 4054834, at *3
(S.D.N.Y. Aug. 28, 2019) (quoting *Kalimantano GmbH v. Motion in Time, Inc.*,
939 F. Supp. 2d 392, 404 (S.D.N.Y. 2013)).  The Court has thus considered several documents
from the underlying Preference Claim litigation, including the Bankruptcy Court's summary
judgment and post-trial decisions, and the District Court's affirmance.  The AC relies extensively
on these documents in developing its malpractice claims; as such, they are integral to the
complaint, and, at minimum, properly the subject of judicial notice.

### B.     Lyondell's Preferential Transfers and Filing for Bankruptcy

In December 2007, Basell B.V. ("Basell"), a Netherlands petrochemical company, acquired Lyondell in a leveraged buyout ("LBO").  *Id.* ¶ 25.  Basell is indirectly owned by Access, which organized the LBO.  *Id.*  Following the LBO, Basell was renamed LBI, and Lyondell became its subsidiary.  *Id.*  In early 2008, LBI began running into financial trouble, and, on March 27, 2008, it and Lyondell entered into a credit agreement with Access (the "Revolver Agreement").  *Id.* ¶ 26.  Under that agreement, Lyondell had access to a $750 million revolving credit facility, which it could draw upon on a day's notice and hold until September 28, 2009, if it wished.  *Id.*

On October 15, 2008, Lyondell borrowed $300 million from Access under the Revolver Agreement.  *Id.* ¶ 27.  Lyondell repaid the $300 million in equal payments over the course of the next few days, specifically on October 16, 17, and 20, 2008.  *Id.*

On January 6, 2009, Lyondell filed for bankruptcy.  *Id.* ¶ 28.  A few months later, LBI did the same.  *Id.*  The Trust was later created under the Chapter 11 reorganization plan of LBI and its affiliated entities, including Lyondell.  *Id.* ¶ 29.  Weisfelner was named its first trustee. *Id.* ¶ 30.

### C.     The Underlying Preference Claim Litigation

In July 2009, litigation relating to Lyondell and LBI's bankruptcy commenced.  *See id.* ¶ 31.  Among the claims filed was the $300 million Preference Claim against Access.[2]  *Id.* Sometime after its Chapter 11 plan became effective on April 30, 2010, Lyondell assigned the

---

[2] In litigating an avoidable preference claim, a trustee seeks to recover payments made by an insolvent debtor to a creditor soon before the debtor filed for bankruptcy.  *See* AC ¶ 32; 11 U.S.C. § 567(b).

Preference Claim to the Trust.  *See id.* ¶ 29.  The Preference Claim proceeded to summary

judgment and later to a bench trial.

### 1.    Summary Judgment

Brown Rudnick, on behalf of the Trust, moved for summary judgment on the Preference

Claim.  *Id.* ¶ 41; *see also* Dkt. 27 ("Clark Decl."), Ex. 14 ("SJ Op.") at 3–6.  Access cross-moved

for summary judgment based on an affirmative defense.  *See* AC ¶ 113 n.24; SJ Op. at 6–9.

### a.    Brown Rudnick's Motion for Summary Judgment

In its motion for summary judgment, Brown Rudnick argued that it had established the

elements of an avoidable preference claim, and that it was entitled to a presumption that

Lyondell was insolvent at the time of the transfers.  SJ Op. at 3, 5.  Under 11 U.S.C. § 547(b),

which governs preference claims, a trustee may "avoid a transfer by the debtor to a creditor

within 90 days prior to bankruptcy if the debtor was insolvent at the time of the transfer."[3]  AC

¶ 32.  The debtor is presumed insolvent for transfers made within those 90 days, although this

presumption can be rebutted.  *See id.*  Brown Rudnick argued that Lyondell should be presumed

insolvent, because the Preference Claim was based on Lyondell's repayment of the $300 million

to Access within 90 days of Lyondell's filing for bankruptcy.  *See* AC ¶¶ 27, 40; SJ Op. at 5.

Access attempted to rebut this presumption by showing that Lyondell was in fact solvent

at the time of the transfers.  *See* AC ¶¶ 42–44.  Access did so by presenting valuations of

Lyondell, including an expert's adjusted valuation that valued the company's assets in October

2008 at a low-end value of $10.6 billion and a mid-point value of $12.23 billion.  *See id.* ¶ 43.

---

[3] In this legal malpractice action, the AC recounts relevant law pertaining to the underlying
action.  The Court takes judicial notice of such case law.  *See Pani v. Empire Blue Cross Blue
Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on
matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law
and statutes.").

Access also presented evidence that Lyondell's direct liabilities were $9.1 billion. *Id.* ¶ 44. It then argued that there was sufficient evidence to rebut the presumption that Lyondell was insolvent because Lyondell's assets exceeded its liabilities and there was a dispute as to whether Lyondell was liable under any guarantees. *Id.* Significant here, Access's calculations did not account for an $8 billion intercompany debt that Lyondell owed. *See id.* ¶¶ 3, 45. A large portion of this $8 billion debt was a $7.16 billion intercompany note, which Lyondell had filed as an exhibit and which Access referenced only in relation to its affirmative defense. *See id.* ¶¶ 45, 49.

Brown Rudnick, however, did not focus on Lyondell's stand-alone solvency, but instead the solvency of LBI as a whole. *See, e.g.*, *id.* ¶ 41. Brown Rudnick's theory was that Lyondell was insolvent only if LBI was also insolvent. *Id.* ¶ 37. The AC alleges that Brown Rudnick's theory was wrong. *See id.* ¶ 38. It further alleges that, in choosing to pursue this theory, Brown Rudnick forewent the theory that Lyondell itself was insolvent, and therefore did not present expert evidence at summary judgment of Lyondell's stand-alone insolvency, *id.* ¶ 5, or offer evidence of Lyondell's $8 billion debt to other LBI entities or the intercompany note, *see id.* ¶¶ 41, 48. Instead, Brown Rudnick called the intercompany note "immaterial." *Id.* ¶ 49. Had Brown Rudnick advised the Bankruptcy Court of Lyondell's $8 billion debt, the AC alleges, Lyondell's liabilities would have clearly outstripped its assets, entitling the Trust to the presumption of insolvency—and summary judgment. *See id.* ¶¶ 4, 47, 52.

The Bankruptcy Court denied Brown Rudnick's motion for summary judgment. *See id.* ¶ 52; *see also* SJ Op. at 5–6. It found that Brown Rudnick had established all but one element of

an avoidable preference claim: Lyondell's insolvency.[4]  *See* SJ Op. at 4–5.  As to that element, it held that Access had rebutted the presumption of Lyondell's insolvency, and that disputed issues of fact remained.  *See* AC ¶ 52; *see also* SJ Op. at 5–6.

At some point after trial, Brown Rudnick attorneys marked up Access's summary judgment briefing and wrote that Access's valuation of Lyondell "plus $8 billion debt = insolvent."  AC ¶ 53 (emphasis omitted).

*b.*     *Access's Motion for Summary Judgment*

Access cross-moved for summary judgment, asserting the "ordinary course" affirmative defense.  *See id.* ¶ 113 n.24; *see also* SJ Op. at 8.  For this defense to succeed, a transferee must show that "the debt (1) was incurred 'in the ordinary course of business or financial affairs of the debtor and the transferee' and (2) was repaid 'in the ordinary course of business or financial affairs of the debtor and the transferee' or pursuant to ordinary business terms."  AC ¶ 114 (quoting 11 U.S.C. § 547(c)(2)).

Access argued that Lyondell had drawn on the Access credit facility according to the terms of the Revolver Agreement, and that Lyondell had incurred and repaid the debt in its ordinary course of business.  *See id.* ¶ 115; SJ Op. at 8.

The Bankruptcy Court denied summary judgment to Access on this claim, finding that unresolved issues of fact precluded summary judgment.  AC ¶ 113 n.24; SJ Op. at 8–9.

**2.     Trial**

In 2016, the Bankruptcy Court held a bench trial on the Preference Claim, along with the other remaining claims.  AC ¶ 31.  In pursuing malpractice claims against Brown Rudnick, the

---

[4] The Bankruptcy Court also noted that there was a disputed issue of fact related to the threshold question of whether the transferred property was in fact Lyondell's.  SJ Op. at 5.

AC highlights two aspects of the trial: (1) the failure to offer evidence of Lyondell's stand-alone insolvency, and (2) the improper valuation of LBI.  Access again asserted its affirmative defense.

a.        <em>Lyondell's Insolvency</em>

At trial, Brown Rudnick did not argue that the presumption of insolvency was applicable. *See id.* ¶ 54.  Instead, it waived the presumption, stating that it was the Trust's burden to prove insolvency.  *Id.*

As during the summary judgment stage, Brown Rudnick continued to focus on LBI's insolvency, rather than that of Lyondell.  *See id.* ¶¶ 35–37.  Brown Rudnick analyzed only LBI's balance sheet, rather than Lyondell's, and did not consider Lyondell's assets and liabilities on their own terms.  *See id.* ¶¶ 7, 58.  Along these lines, the AC faults Brown Rudnick for not presenting evidence of Lyondell's intercompany debt or expert testimony as to Lyondell's insolvency.  *See id.* ¶¶ 35–36, 75.

First, it alleges, Brown Rudnick did not gather or present evidence of Lyondell's stand-alone insolvency.  *Id.* ¶ 35.  Nor did Brown Rudnick present evidence of Lyondell's $8 billion debt, including the $7.16 billion intercompany note.  *See id.* ¶¶ 65, 75.  These debts, the AC alleges, could have been added to Access's own calculations of Lyondell's balance sheet to demonstrate Lyondell's insolvency.  *See, e.g.*, *id.* ¶¶ 4, 74.

Second, Brown Rudnick retained an expert, Anders Maxwell, but did not instruct Maxwell to value Lyondell.  *See id.* ¶ 36.  Instead, Maxwell was asked to provide—and provided—an opinion only as to LBI.  *Id.*  Brown Rudnick proposed to call Maxwell to testify to Lyondell's stand-alone insolvency.  *See id.* ¶ 61.  But, because Maxwell had not disclosed any opinion as to Lyondell's insolvency before trial, the Court excluded Maxwell's opinions on that subject.  *Id.*  As a result, no experts testified specifically to Lyondell's insolvency.  *Id.* ¶¶ 36–37.

7

        *b.*      *Valuation of LBI*

As to the valuation of LBI, the AC alleges that Brown Rudnick made another misstep:  It used data from December 2008 to prove that LBI was insolvent in October 2008.  *Id.* ¶ 82.

The case law requires a trustee who seeks to prove insolvency using evidence from dates other than the date of the alleged transfer—here, Lyondell's $300 million transfer—to demonstrate that the debtor's financial condition did not materially change between such date and the date of transfer.  *See id.* ¶ 83.  But, the AC alleges, with regard to the December 2008 data, Brown Rudnick did not do so.  *See id.* ¶¶ 84–85.  LBI's financial position declined substantially between October 2008 and December 2008, due to the Great Recession—a point Maxwell acknowledged at trial.  *Id.* ¶ 85.  And Brown Rudnick presented no evidence suggesting that LBI's financial position remained the same during that time period.  *See id.*

In an attempt to justify the use of the December 2008 projections, Maxwell, in his expert report, wrote that these projections were "developed during the 2nd half of 2008 and available in October."  *Id.* ¶ 88.  The AC alleges that this contention lacked factual support.  *Id.* ¶ 89.

Further, the AC alleges, better data was available, which Brown Rudnick did not use.  Specifically, there were financial projections from April 2008.  *See id.* ¶ 93.  Under these, Lyondell was insolvent in April 2008, and there is no dispute that its financial position worsened between then and October 2008.  *Id.* ¶ 94.  However, Brown Rudnick did not use the April 2008 projections to prove LBI or Lyondell's insolvency.  *See id.* ¶ 95.

        *c.*      *Access's Affirmative Defense*

At trial, Access asserted the ordinary-course affirmative defense.  *See In re Lyondell Chem. Co.* ("*Lyondell I*"), 567 B.R. 55, 121 (Bankr. S.D.N.Y. 2017) (Bankruptcy Court's post-trial opinion).  Access argued that the Revolver Agreement was ordinary both for Lyondell and Access.  AC ¶ 115.  But Access did not offer direct evidence at trial that it commonly provided

loans to its affiliates, that Lyondell had access to other revolving lines of credit, or that Lyondell

drew on the Access line of credit before October 2008. *See id.* ¶¶ 115–17. The evidence showed

that Access declined to fund an attempt by Lyondell to draw on the line of credit in December

2008. *Id.* ¶ 117.

### 3.  Post-Trial Briefing and Closing Arguments

In its post-trial briefing, Brown Rudnick argued—for the first time—that it was the

solvency of *Lyondell*, not LBI, that mattered. *Id.* ¶¶ 6, 56. Specifically, it attempted to

extrapolate Lyondell's valuation in October 2008 from a December 2007 valuation of LBI. *See

id.* ¶ 63. And because it had not introduced evidence of Lyondell's $8 billion debt or the

intercompany note at trial, it tried to prove the existence of an "$8.0 billion Related Party Note"

through reference to Lyondell's securities filings. *See id.* ¶ 65. But, having failed to direct

Maxwell to value Lyondell alone, Brown Rudnick could not point to any expert opinion or other

facts from trial to prove Lyondell's stand-alone insolvency. *See id.* ¶¶ 62–63.

During closing argument following the post-trial submissions, the Bankruptcy Court

expressed confusion about the existence of the $8 billion debt and the intercompany note. *See id.*

¶ 67 ("THE COURT: It wasn't a note; it was—was it a—is there a note—[.] MR. POHL: Yes

. . . there's a note. I don't have the note[.]"). The Bankruptcy Court also repeatedly questioned

Brown Rudnick as to whether Maxwell considered the $8 billion debt in his solvency analysis.

*See id.* ¶ 68. Brown Rudnick confirmed that he did not. *See id.*

After closing argument, Brown Rudnick submitted a letter addressing the $8 billion debt

and arguing that it was relevant to the Lyondell's solvency analysis. *Id.* ¶ 69. Access responded,

pointing out that Brown Rudnick had focused on *LBI*'s solvency at trial; never offered a

stand-alone valuation or expert opinion on Lyondell; never introduced the intercompany note

into evidence; and characterized the intercompany note as "immaterial" to solvency during the summary judgment briefing. *See id.* ¶ 71.

### 4.   Bankruptcy Court Decision

On April 21, 2017, the Bankruptcy Court issued its findings of fact and conclusions of law. *See generally Lyondell I*, 567 B.R. 55.  The Bankruptcy Court held that the Trust had failed to prove by a preponderance of the evidence that LBI or Lyondell was insolvent at the time Lyondell transferred the $300 million in October 2018.  *See id.* at 148–49; *see also* AC ¶¶ 57, 64, 75.

### a.   Lyondell's Insolvency

The Bankruptcy Court emphasized that Lyondell was the relevant debtor for purposes of the Preference Claim.  *See Lyondell I*, 567 B.R. at 148.  It noted, however, that "[t]he Trustee chose not to present specific evidence of Lyondell's stand-alone insolvency at trial."  *Id.* at 107; *see also id.* at 149; AC ¶ 35.  As a result, the Bankruptcy Court found that the Trust had not presented sufficient evidence of Lyondell's insolvency.  *See Lyondell I*, 567 B.R. at 148–49.  Because Brown Rudnick had focused on LBI—not Lyondell—as the relevant debtor throughout the trial, the only evidence the Bankruptcy Court could look to for Lyondell's insolvency was Maxwell's testimony.  *See id.*; *see also id.* at 148 ("The Trustee did not argue that Lyondell (as opposed to LBI) was the relevant debtor for the preference claim until his post-trial briefing and closing arguments.").  However, the Court found Maxwell not credible and declined to "extrapolate Lyondell's stand-alone insolvency based on Maxwell's unreliable testimony."  *See id.* at 149; *see also id.* at 106–07 (explaining reasons for finding Maxwell not credible).  In so concluding, the Bankruptcy Court emphasized, "[i]t bears repeating that the Trustee changed course on this issue at the eleventh hour, after arguing for the entire trial that LBI was the relevant entity" for the solvency determination.  *See id.* at 149; *see also id.* at 107.

b.  *LBI's Valuation*

The Bankruptcy Court also opined on Maxwell's valuation of LBI, including his use of data from December 2008.  As to the variance in LBI's financial position between October and December 2008, the Bankruptcy Court found that "Maxwell's use of the 2008 LRP Projections, which were not finalized and presented until December 2008, is unpersuasive as to LBI's financial condition two months earlier in mid-October 2008, in light of the substantial deterioration in LBI's financial performance thereafter."  *Id.* at 105; *see also* AC ¶ 87.

The Bankruptcy Court also rejected Maxwell's contention that the December 2008 projections were available in October of that year.  *See Lyondell I*, 567 B.R. at 65.  It noted that Brown Rudnick did not offer evidence of any draft projections from October.  *Id.* at 65, 105. The Bankruptcy Court pointedly stated that "it strains credulity to believe that LBI would have fully drafted its projections in October (without producing any record of such drafts), watched the Great Recession begin to unfold all around it, discussed in December the dramatic decline of its business, and yet used the exact same numbers it drafted in October without a single change to reflect the economic decline of the last two months."  *Id.* at 65; *see also* AC ¶ 90.

Without reliable evidence of Lyondell or LBI's insolvency in October 2008, the Bankruptcy Court held that the Trust had not proved that Lyondell's transfers to Access were an avoidable preference.  *Lyondell I*, 567 B.R. at 148–49; *see also* AC ¶ 91.

The AC alleges that but for Brown Rudnick's negligence in analyzing the wrong debtor (LBI) and the wrong date (December 2008) in the insolvency inquiry, the Trust would have prevailed.  *See* AC ¶¶ 110–12.

c.  *Access's Affirmative Defense*

The Bankruptcy Court did not address Access's affirmative defense in its post-trial decisions because it found that the Trust had not proved Lyondell's insolvency, making an

11

affirmative defense unnecessary.  *See Lyondell I*, 567 B.R. at 121; *see also* AC ¶ 113 n.24.

Nevertheless, the AC alleges that, given the lack of evidence and the nature of this quick loan

and repayment, Access failed to establish its affirmative defense at trial.  *See* AC ¶¶ 116–17.

> **5.    Appeal**

After losing the Preference Claim, Brown Rudnick appealed and enlisted the help of

Kellogg, Hansen, Todd, Figel & Frederick PLLC ("Kellogg Hansen") for that appeal.  *Id.* ¶ 76.

Brown Rudnick admitted to Kellogg Hansen that it would have succeeded at summary judgment

had it relied upon the intercompany note.  *Id.* ¶ 78.  In communications with Kellogg Hansen,

Brown Rudnick partners stated the following:

- Their realization about the importance of the $8 billion debt was "too little, too late," *id.* ¶ 80;

- "the computations that Access presented [at summary judgment] were carried out without reference to the $8bb intercompany claim," *id.* ¶ 79 (alteration in original) (brackets and emphasis omitted);

- "[t]he computations done to show LYO [Lyondell] was insolvent, even on the best case (to be confirmed), would fail and show insolvency once the $8bb IC claim is added," *id.* (second alteration in original) (emphasis omitted);

- "Quinn [counsel to Access] comes up with a best case for LCC [Lyondell] standalone and how much 'solvency' cushion there is all of that was done excluding the $8bb—which, if included, I think absorbs all the cushion," *id.* (alteration in original);

- "notion that if LBI is solvent, LCC must be too—wrong based on 8 bb!!" *id.* (brackets and emphasis omitted);

- "with record evidence of LCC standalone debt of over 21bb, this evidence supports it not being a close call for LCC," *id.* (brackets and emphasis omitted); and

- "[i]ssues of [Lyondell's] share of contingent liabilities are not germane one [sic] you add in the 8BB interco," *id.* (second alteration in original).

On appeal, Brown Rudnick's primary argument concerned the presumption of insolvency. AC ¶ 104. It argued that Access had the burden to rebut the presumption of insolvency at trial and failed to do so. *Id.* On January 24, 2018, the Hon. Denise Cote of the Southern District of New York rejected this contention and affirmed the Bankruptcy Court's decision on the Preference Claim. *See In re Lyondell Chem. Co.* ("*Lyondell II*"), 585 B.R. 41, 60–62 (S.D.N.Y. 2018); *see also* AC ¶¶ 103–04. Judge Cote stated that Brown Rudnick had "not only failed to bring this alleged error to the attention of the bankruptcy court, but also affirmatively agreed that the defendants had no obligation to produce any evidence establishing solvency, necessarily implying that the statutory presumption had been vitiated." *Lyondell II*, 585 B.R. at 60; *see also* AC ¶ 104.

With regard to Lyondell's insolvency, Judge Cote observed that "the focus of the trial" was LBI's solvency, not Lyondell's.[5] *See Lyondell II*, 585 B.R. at 61; *see also* AC ¶ 105. She noted, too, that Maxwell expressed no opinion as to Lyondell's stand-alone valuation. *See In re Lyondell*, 585 B.R. at 61; *see also* AC ¶ 105. She held that Brown Rudnick had "altogether failed" to demonstrate Lyondell's insolvency in 2008, commenting that this was "not surprising in light of the focus of the Trustee below on Maxwell's testimony, and on proving the insolvency

---

[5] On appeal, Brown Rudnick did not focus on the $8 billion debt. AC ¶ 107. Judge Cote therefore addressed other non-expert evidence that Brown Rudnick had referenced in its briefing and rejected those as insufficient to show that Lyondell was insolvent. *See Lyondell II*, 585 B.R. at 63–64; *id.* ¶ 108.

of LBI rather than Lyondell on a stand-alone basis." *Lyondell II*, 585 B.R. at 64; *see also* AC ¶ 109.

Judge Cote also considered the Bankruptcy Court's finding that the December 2008 projections used by Maxwell in valuing LBI did not accurately reflect LBI's financial position in October 2008. *See Lyondell II*, 585 B.R. at 62.   She affirmed this finding, explaining that it was based on the Bankruptcy Court's "careful evaluation of and intimate familiarity with the record[.]" *Id.*

### D.      Relations Between Brown Rudnick and the Trust

Neither Brown Rudnick nor Weisfelner advised the Trust's Advisory Board that Brown Rudnick had blundered in pursuing the Preference Claim, including by failing to introduce evidence to maintain the presumption of insolvency, by failing to present an expert opinion on Lyondell's insolvency alone, and by using the wrong dates for its valuation of LBI. *See* AC ¶¶ 99, 100–01.   Had Brown Rudnick been transparent about its negligence, that would have informed the Trust's settlement discussions with Access, which took place before, during, and after the trial. *Id.* ¶¶ 97–98.   The AC alleges that, had Brown Rudnick given candid advice on these matters, in late 2016 and early 2017, the parties could have settled. *Id.* ¶ 102.

On July 31, 2018, a beneficiary of the Trust informed the Trust's Advisory Board that the beneficiary believed the Trust had viable malpractice claims against Brown Rudnick. *Id.* ¶ 120. The beneficiary offered to purchase the claims from the Trust, and demanded that, if that offer were not accepted, the Trust Advisory Board appoint an independent trustee to evaluate the malpractice claims; Weisfelner, as a Brown Rudnick partner, was conflicted. *Id.*   The Trust Advisory Board retained counsel, who advised that the Trust had viable claims. *Id.* ¶ 121.   The board then removed Weisfelner. *Id.*

After Holliday succeeded Weisfelner as trustee, Brown Rudnick and Weisfelner refused to turn over the Trust's client file to Holliday.  *See id.* ¶¶ 16, 122–24.  Brown Rudnick contended that to get the file, the Trust would have to pay a large sum to facilitate Brown Rudnick's privilege and relevance review.  *Id.* ¶ 122.  The Trust offered to pay $25,000.  *Id.* ¶ 123.  Brown Rudnick has not produced any documents from the file.  *Id.*

### E.    Procedural History of This Litigation

On November 26, 2019, Holliday commenced this action by filing the initial complaint. Dkt. 1.  On January 15, 2020, Brown Rudnick moved to dismiss.  Dkts. 12–14.  On January 16, 2020, the Court ordered Holliday to either amend his complaint or oppose the motion to dismiss. Dkt. 16.  On February 5, 2020, Holliday amended his complaint.  AC.  On February 26, 2020, Brown Rudnick filed the present motion to dismiss, Dkt. 25, along with a memorandum of law in support, Dkt. 26 ("Def. Mem."), and the declaration of Christopher J. Clark, Esq., Dkt. 27 ("Clark Decl."), and its attached exhibits.  On March 11, 2020, Holliday filed his memorandum in opposition, Dkt. 30 ("Pl. Mem."), and the declaration of Joshua J. Bruckerhoff, Esq., ("Bruckerhoff Decl."), and its attached exhibit.  On March 18, 2020, Brown Rudnick filed its reply.  Dkt. 32 ("Def. Reply").

## II.    Applicable Legal Principles

### A.    Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is

properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d at 145. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.  Discussion

The AC brings three state-law claims against Brown Rudnick: (1) legal malpractice for loss of the $300 million Preference Claim; (2) legal malpractice for the lost settlement value related to the Preference Claim; and (3) breach of fiduciary duty for refusing to turn over the Trust's client file. Brown Rudnick moves to dismiss all three claims. The Court addresses the legal malpractice claims, followed by the breach of fiduciary duty claim.

### A.  Legal Malpractice

#### 1.  Applicable Legal Principles

"In a diversity action based on attorney malpractice, state substantive law . . . applies." *Nordwind v. Rowland*, 584 F.3d 420, 429 (2d Cir. 2009) (quoting *Rubens v. Mason* ("*Rubens II*"), 527 F.3d 252, 254 (2d Cir. 2008)). Here, both parties apply New York law in their submissions, and the Court agrees that such law applies: Where "[t]he parties' briefs assume that New York law controls . . . such 'implied consent . . . is sufficient to establish choice of law.'" *Wolfson v. Bruno*, 844 F. Supp. 2d 348, 354 (S.D.N.Y. 2011) (alterations in original) (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)).

For a claim of legal malpractice under New York law, a plaintiff must allege: "(1) attorney negligence; (2) which is the proximate cause of a loss; and (3) actual damages."

*Nordwind*, 584 F.3d at 429 (emphasis and citation omitted); *accord Ocean Ships, Inc. v. Stiles*, 315 F.3d 111, 117 (2d Cir. 2002) (describing elements as "(1) a duty, (2) a breach of the duty, and (3) proof that the actual damages were proximately caused by the breach of the duty." (quoting *Tinelli v. Redl*, 199 F.3d 603, 606 (2d Cir. 1999))).

As to the attorney negligence element, "to show negligence in a legal malpractice case, a plaintiff must allege that the attorney's conduct 'fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of the profession.'" *Capogrosso v. Lecrichia*, No. 07 Civ. 2722 (BSJ), 2010 WL 2076962, at *5 (S.D.N.Y. May 24, 2010) (quoting *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006)). A plaintiff, however, fails to state a claim for malpractice if he alleges only an "error of judgment" or a "selection of one among several reasonable courses of action." *Achtman*, 464 F.3d at 337 (quoting *Rosner v. Paley*, 65 N.Y.2d 736, 738 (1985)).

As to the causation element, the Second Circuit has explained that "[t]o establish proximate cause, 'the client must meet a case within a case requirement,'" *Rubens II*, 527 F.3d at 255 (internal quotation marks and citation omitted), and "must demonstrate that a reasonable fact-finder could conclude that a 'reasonable fact-finder in the underlying suit would have arrived at a different result but for the attorney's negligence,'" *id.* (quoting *Rubens v. Mason* ("*Rubens I*"), 387 F.3d 183, 189 (2d Cir. 2004)). *See also D'Jamoos v. Griffith*, 340 F. App'x 737, 739 (2d Cir. 2009) ("[A] plaintiff must show that but for the defendant's negligence, . . . he would have prevailed in the underlying action or would not have sustained any damages." (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 118 (2d Cir. 2005))); *Dweck Law Firm, LLP v. Mann*, 727 N.Y.S.2d 58, 59–60 (1st Dep't 2001) ("[T]he client must plead

specific factual allegations establishing that but for counsel's deficient representation, there would have been a more favorable outcome to the underlying matter.").

As noted, the final element of a malpractice claim is damages:  A plaintiff must demonstrate he "suffered actual and ascertainable damages."  *Rubens I*, 387 F.3d at 189 (citing *McCoy v. Feinman*, 99 N.Y.2d 295, 301–02 (2002)).

### 2. Loss of Preference Claim

The AC alleges that Brown Rudnick committed malpractice in losing the Preference Claim, specifically in its performance at summary judgment and during trial.  Brown Rudnick does not appear to contest that the AC adequately pleads damages.  It argues that the AC fails to adequately plead (1) attorney negligence or (2) proximate causation.

#### a. *Attorney Negligence*

The AC alleges that Brown Rudnick was negligent in (i) its focus on LBI, not Lyondell, as the relevant debtor; (ii) its failure to introduce evidence of Lyondell's $8 billion intercompany debt, including the $7.16 billion intercompany note; (iii) its failure to introduce expert testimony to value Lyondell; and (iv) its use of December 2008 data as the basis for its valuation of LBI in October 2008.  Brown Rudnick's principal counter is that its decisions were reasonable strategic decisions in the context of this suit and the broader bankruptcy litigation.  *See, e.g.*, Def. Mem. at 9.

Brown Rudnick is correct that "allegations that amount to nothing more than plaintiff's 'dissatisfaction with strategic choices . . . do not support a malpractice claim as a matter of law.'" *Hatfield v. Herz*, 109 F. Supp. 2d 174, 180 (S.D.N.Y. 2000) (alteration in original) (quoting *Bernstein v. Oppenheim & Co.*, 554 N.Y.S.2d 487, 490 (1st Dep't 1990)); *see also Estate of Re v. Kornstein Veisz & Wexler*, 958 F. Supp. 907, 921 (S.D.N.Y. 1997) ("An attorney cannot be held liable for malpractice for reasonable discretion exercised during the course of a litigation.");

18

*Brookwood Cos. v. Alston & Bird LLP*, 49 N.Y.S.3d 10, 15 (1st Dep't 2017) ("Decisions regarding the evidentiary support for a motion or the legal theory of a case are commonly strategic decisions and a client's disagreement with its attorney's strategy does not support a malpractice claim, even if the strategy had its flaws."). That is because under the attorney judgment rule, an attorney's choice between reasonable actions does not constitute malpractice, including "[a]n attorney's *reasonable* decisions relating to such matters as cross-examination, witness presentation, and brief writing[.]" *Estate of Re*, 958 F. Supp. at 923 (emphasis added).

To be entitled to protection under that rule, "an attorney must offer a 'reasonable strategic explanation' for the alleged negligence." *Ackerman v. Kesselman*, 954 N.Y.S.2d 103, 106 (2d Dep't 2012) (quoting *Pillard v. Goodman*, 918 N.Y.S.2d 461, 463 (1st Dep't 2011)); *see also Brown Rudnick, LLP v. Surgical Orthomedics, Inc.*, No. 13 Civ. 4348 (JMF), 2014 WL 3439620, at *7 (S.D.N.Y. July 15, 2014). However, where it is plausible that the attorney did not act in a strategic or reasonable manner, dismissal is not appropriate. *Cf. Hatfield*, 109 F. Supp. 2d at 180 (at summary judgment, "[f]indings of fact are unnecessary where a court concludes that an attorney's conduct was 'reasonable . . . as a matter of law'" (quoting *Bernstein*, 554 N.Y.S.2d at 489)).

Construing the facts in Holliday's favor, the AC has plausibly pled that Brown Rudnick's decisions were neither strategic nor reasonable.

The Court first considers the allegations in the complaint. *See Ackerman*, 954 N.Y.S.2d at 105–06 (denying motion to dismiss where complaint alleged that there was "no apparent strategic reason" for attorney's decision); *cf. Brookwood Cos.*, 49 N.Y.S.3d at 15 (dismissing malpractice claim because complaint did not include facts to support plaintiff's claim that attorney's evidentiary decision was unreasonable). On the face of the AC, Holliday alleges that

there was no reasonable strategic basis for Brown Rudnick to focus on LBI alone, to fail to introduce evidence—before closing argument or post-trial motions—related to Lyondell's stand-alone insolvency, or for its use of the December 2008 data.  *See, e.g.*, AC ¶¶ 11, 38, 58 (focus on LBI alone unreasonable); *id.* ¶¶ 39, 50, 75 (failure to introduce evidence, including expert evidence, of Lyondell insolvency unreasonable); *id.* ¶¶ 9, 11 (use of December 2008 data unreasonable).

The Court next looks to the reasons Brown Rudnick offers, in its memorandum, for these choices.  Brown Rudnick argues that its focus on LBI alone was a viable strategy because it sidestepped issues of whether Lyondell could be insolvent if LBI was solvent and enabled a more cohesive narrative focused on LBI's alleged insolvency.  *See* Def. Mem. at 11–12.  As to evidence of Lyondell's intercompany debt, Brown Rudnick contends that it was not required to formally offer the intercompany note into evidence, and that it did acknowledge the note in post-trial briefing and closing arguments.  *See id.* at 13; *see also id.* at 16.  Further, it argues that Maxwell's focus on LBI instead of Lyondell was simply a continuation of Brown Rudnick's reasonable strategy of treating LBI as the relevant debtor.  *See id.* at 17.  Finally, Brown Rudnick contends that Maxwell's use of the December 2008 data to assess LBI's financial position in October 2008 was reasonable and within his expert discretion, given that no financial projections from October 2008 existed and that he had determined that the April 2008 projections were unreliable.  *See id.* at 17–19.

The AC pleads facts that substantially challenge each of these stated justifications, making each a fair ground for discovery and requiring denial of the motion to dismiss.

First, as to Brown Rudnick's focus on LBI and failure to offer evidence of Lyondell's stand-alone insolvency, the AC alleges that Brown Rudnick's own attorneys made contradictory

statements on this point.  For example, the AC alleges that a Brown Rudnick partner told Kellogg Hansen attorneys that the "notion that if LBI is solvent, LCC [Lyondell] must be too—wrong based on 8 bb!!"  AC ¶ 79 (alteration in original) (emphasis omitted).  And another partner stated that Brown Rudnick's realization of the importance of the $8 billion debt, on which it did not focus until post-trial briefing and closing argument, was "too little, too late."  *Id.* ¶ 80 (emphasis omitted).  Along these same lines, the AC alleges that Brown Rudnick partners admitted that "[t]he computation done to show LYO [Lyondell] was insolvent, even on the best case (to be confirmed), would fail and show insolvency once the $8bb IC claim is added"; Access's counsel came up with the "best case for LCC [Lyondell] standalone and how much 'solvency' cushion there is all of that was done excluding the $8bb—which, if included, I think absorbs all the cushion"; and "[i]ssues of [Lyondell's] share of contingent liabilities are not germane one [sic] you add in the 8BB interco."  *Id.* ¶ 79 (alterations in original) (emphasis omitted); *see also id.* ¶ 53 (Brown Rudnick attorney's later note on Access's summary judgment valuation of Lyondell: "plus $8 billion debt = insolvent" (emphasis omitted)).  Brown Rudnick partners further recognized that when this debt was accounted for, the "evidence supports it not being a close call for LCC."  *Id.* ¶ 79 (emphasis omitted).

Next, as to the December 2008 data, the factual allegations in the AC make it a question of fact whether Brown Rudnick's use of that data was reasonable.  As Holliday points out, the Bankruptcy Court found that reliance on the December 2008 projections may have been "independently fatal" to the Preference Claim.  *Lyondell I*, 567 B.R. at 65.  And although Maxwell allegedly determined that the April 2008 data was unreliable for his valuation of LBI, the AC alleges that the April 2008 projections prove that *Lyondell* was insolvent at the time—and remained insolvent in October 2008.  AC ¶ 94.

Even though counsels' theories of the case and evidentiary calls are often protected as strategic, courts have denied motions to dismiss where attorneys have not presented convincing explanations for such a decision. *See, e.g.*, *Brown Rudnick, LLP*, 2014 WL 3439620, at *8 (failure to present expert testimony); *Pillard*, 918 N.Y.S.2d at 463 (failure to introduce evidence). Considering the AC's allegations alongside Brown Rudnick's proffered reasons for its litigation choices, there are, at minimum, questions of fact as to whether Brown Rudnick deliberately made such choices and whether those choices were reasonable. *See, e.g.*, *Camarda v. Danziger, Bangser & Weiss*, 561 N.Y.S.2d 233, 233–34 (1st Dep't 1990) (denying motion to dismiss because questions of fact existed as to whether attorneys acted reasonably in failing to advise plaintiff as to consequences of LBO); *cf. Prout v. Vladeck*, 371 F. Supp. 3d 150, 159 (S.D.N.Y. 2019) (denying summary judgment for attorney where there was "a genuine dispute as to whether [the law firm's] conduct fell within the range of 'reasonable courses of action' that would immunize it from malpractice liability" (citation omitted)). As such, the Court finds the AC has adequately pled attorney negligence as to the loss of the Preference Claim.

> b.   *Causation*

Defendants next argue that the AC does not adequately plead that Brown Rudnick's errant decisions proximately caused the Trust's injuries. *See* Def. Mem. at 19–21. As noted, to allege proximate causation, a plaintiff must allege "that but for the defendant's negligence, he or she would have prevailed in the underlying action or would not have sustained any damages." *In re Joseph DelGreco & Co.*, 535 F. App'x 31, 33 (2d Cir. 2013) (quoting *Allianz*, 416 F.3d at 118). The AC has more than done so.

The AC first alleges that the Trust would have prevailed at summary judgment had Brown Rudnick introduced evidence of Lyondell's enormous intercompany debt. AC ¶ 52; *see also id.* ¶¶ 110, 112. Had Brown Rudnick done so, it alleges, the Bankruptcy Court would have

found Lyondell to be insolvent because, even on Access's calculations, Lyondell's liabilities (around $16.2 billion, including the intercompany debt) would have clearly outstripped its assets (around $12.23 billion). *See id.* ¶¶ 46–47.  It is plausible, with that evidence, that the Bankruptcy Court would no longer have found that Lyondell's solvency was a disputed question of fact.

The AC next alleges that but for Brown Rudnick's myopic focus on LBI and its failure to introduce evidence of Lyondell's insolvency—both as to Lyondell's debts and expert testimony of its valuation—the Trust would have succeeded at trial. *Id.* ¶¶ 75, 111–12.  Factual support clearly exists for these claims.  The Bankruptcy Court held that the Preference Claim analysis should be limited to Lyondell, and that Brown Rudnick's lawyering had hamstrung the Trust by focusing uniquely on LBI until post-trial briefing and argument. *See Lyondell I*, 567 B.R. at 148–49.  Because Brown Rudnick had "argu[ed] for the entire trial that LBI was the relevant entity," the only evidence it had introduced that was potentially relevant to Lyondell's insolvency was Maxwell's testimony as to *LBI*'s valuation. *Id.* at 149.  The Bankruptcy Court declined to extrapolate Lyondell's insolvency from that valuation, which it found unreliable. *Id.*  The AC thus plausibly alleges that had Brown Rudnick earlier introduced evidence of, and relied throughout on, Lyondell's $8 billion debt at trial, the Trust would have succeeded at trial.

The AC also independently alleges that Brown Rudnick and Maxwell's error in using the December 2008 data to value LBI in October 2008 caused the Trust to lose the Preference Claim. *See* AC ¶ 82 (calling this an "equally fatal mistake"); *see also id.* ¶¶ 110, 112.  This allegation draws support from the Bankruptcy Court itself, which held that the use of the December 2008 data was "unpersuasive," and, while noting other problems with Maxwell's credibility, found that this defect was likely "independently fatal" to the claim. *Lyondell I*, 567 B.R. at 65, 105.  The AC then alleges Brown Rudnick could have used data from April 2008, which showed

Lyondell to be insolvent, to demonstrate Lyondell's insolvency in October 2008, and that its failure to do so caused the Trust to lose the Preference Claim. AC ¶ 95. Construing the facts in Holliday's favor, one could reasonably infer that without the December 2008 data, the Bankruptcy Court may have found Maxwell's valuation—the main piece of evidence introduced as to the insolvency of LBI and, by extension, of Lyondell—more reliable.

Brown Rudnick makes two arguments to counter Holliday's claims that its lawyering caused injury.

First, Brown Rudnick relies on a statement from the Bankruptcy Court, which, it contends, shows that Brown Rudnick could succeed only if it established LBI's insolvency. *See* Def. Mem. at 20. The Bankruptcy Court, in finding that Brown Rudnick had failed to show Lyondell was insolvent in October 2008, stated that "[e]ssential to the Trustee's . . . preference claim [is] proving that LBI was insolvent . . . on October 16, 17 and 20 of 2008, when the loan repayments were made." *Lyondell I*, 567 B.R. at 63. But it is a mischaracterization of the Bankruptcy Court's opinion to argue that it held that the only route available to Brown Rudnick was to prove LBI's insolvency. On the contrary, later, the Bankruptcy Court held that *Lyondell* was the relevant debtor for the Preference Claim analysis, and that such analysis should be limited only to it. *Id.* at 148. The Bankruptcy Court's observation that Brown Rudnick needed to prove LBI was insolvent appears to have been artifact of Brown Rudnick's contested decision to pursue that theory only, and its consequent failure to offer evidence of Lyondell's stand-alone insolvency. Given that backdrop, the Bankruptcy Court appears to have been conveying that it could find Lyondell to be insolvent only if it extrapolated such insolvency from Brown Rudnick's evidence as to LBI. It declined to do so. *Id.* at 149.

24

Second, Brown Rudnick argues that Holliday has the burden to show an affirmative defense would not succeed, and that the AC failed to do so for Access's ordinary course affirmative defense. *See* Def. Mem. at 20–21. Brown Rudnick is wrong on both fronts. When alleging a *prima facie* case for legal malpractice, a plaintiff does not have the burden of proving that affirmative defenses will fail.[6] *See Romanian Am. Interests, Inc. v. Scher*, 464 N.Y.S.2d 821, 823 (2d Dep't 1983). And, even if Holliday did have that burden, the AC adequately pleads that Access's affirmative defense came up short. Although the Bankruptcy Court found it unnecessary to rule on Access's affirmative defense, the AC reasonably alleges that the defense would have failed because Access did not introduce any direct evidence at trial to support it. *See* AC ¶¶ 115–16.

The Court thus holds that, for its claim of malpractice based on the loss of the Preference Claim, the AC states a claim against Brown Rudnick. It has adequately pled attorney negligence and causation. Accordingly, the Court denies Brown Rudnick's motion as to that claim.

### 3.    Loss of Settlement Value

The AC brings a second claim of malpractice based on the loss of settlement value attributable to the Preference Claim. As to this claim, the AC alleges that Brown Rudnick committed malpractice by failing to inform the Trust Advisory Board of its malpractice with regard to the litigation of the Preference Claim; instead, it told the board that the claim had a "good prospect of success." *Id.* ¶ 99. The AC alleges that, had Brown Rudnick revealed its mistakes and provided the Trust Advisory Board with candid advice as to the Preference Claim, the Trust Advisory Board could have settled the claim. *Id.* ¶ 102.

---

[6] For the proposition that Holliday bears the burden to disprove affirmative defenses, Brown Rudnick cites *Nitis v. Goldenthal*, 513 N.Y.S.2d 186 (2d Dep't 1987). But there the court noted that the defendant attorney had sustained *his* burden by showing that he had a viable affirmative defense. *Id.* at 188. As such, the court granted summary judgment for the attorney. *Id.*

Brown Rudnick counters that the settlement malpractice claim should be dismissed because it depends on the first malpractice claim, which it contends is deficient.  Def. Mem. at 21.  Because the Court has found the first malpractice claim viable, that argument fails.

Brown Rudnick next argues that it had no duty to inform the Trust Advisory Board because the *Trustee* (at the time, Weisfelner) and the *Trust* were its clients, and the *Trust Advisory Board* was not.  *Id.* at 21–22.  "It is well established that, with respect to attorney malpractice, absent fraud, collusion, malicious acts, or other special circumstances, an attorney is not liable to third parties, not in privity, for harm caused by professional negligence."  *Moran v. Hurst*, 822 N.Y.S.2d 564, 566 (2d Dep't 2006) (citation omitted).

Brown Rudnick is correct that the AC does not allege an attorney-client relationship—or any facts supporting one—between Brown Rudnick and the Trust Advisory Board.  *See* AC ¶ 139 ("Brown Rudnick had an attorney-client relationship with the Trust.").  Reinforcing Brown Rudnick's argument, the AC also references an "engagement letter," which Brown Rudnick entered into with Weisfelner in his capacity as trustee.  *Id.* ¶ 21.  This, too, indicates that the attorney-client relationship was between them.[7]

In response, Holliday argues only that "Brown Rudnick's assertion that it did not have to keep the Trust Advisory Board ("TAB") informed of material matters is baseless."  Pl. Mem.

---

[7] In support of its argument that the Trust Advisory Board was not its client, Brown Rudnick cites the engagement letter, which, it contends, "makes clear that Brown Rudnick had an attorney-client relationship only with Mr. Weisfelner as Trustee and with the Trust."  Def. Mem. at 21.  For avoidance of doubt, while the Court arguably could have considered the entirety of the engagement letter—as Brown Rudnick urged in attaching the full engagement letter to the Clark Declaration, *see* Clark Decl., Ex. 7, Ex. A— the Court, in an excess of caution, has considered only the aspects of the engagement letter referenced by the AC.

at 24.  That is non-responsive.  It does not supply the critical missing factual ingredient: an

attorney-client relationship between the Trust Advisory Board and Brown Rudnick.[8]

The Court therefore dismisses the malpractice claim based on the loss of the Preference

Claim's settlement value.[9]

## B.     Breach of Fiduciary Duty

The AC's final claim is for breach of fiduciary duty, based on Brown Rudnick's refusal

to produce the Trust's client file unless the Trust first paid Brown Rudnick to review the file for

relevance and privilege.  For a breach of fiduciary duty claim, a plaintiff must allege "(i) the

existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting

therefrom."  *Smith v. Smith*, No. 17 Civ. 6648 (PAE), 2019 WL 1755517, at *9

(S.D.N.Y. Apr. 19, 2019) (citation omitted); *accord Johnson v. Nextel Commc'ns, Inc.*,

660 F.3d 131, 138 (2d Cir. 2011).  "In addition, 'where damages are sought for breach of

fiduciary duty . . . the plaintiff must demonstrate that the defendant's conduct proximately

caused injury in order to establish liability.'"  *Smith*, 2019 WL 1755517, at *9 (alteration in

---

[8] Holliday also notes that under the Trust Agreement, the Trust Advisory Board "had the power 'to oversee, manage, and direct the activities of the Litigation Trust and the performance of the Litigation Trustee,' including with respect to any settlement decisions."  Pl. Mem. at 24–25 (citing Bruckerhoff Decl., Ex. 1 ¶¶ 4.1, 4.3(a), 6.2).  The Court again declines to consider the aspects of that agreement that are not incorporated into, attached to, or integral to the AC.  In any event, these portions do not evince, or give rise to, an attorney-client relationship between Brown Rudnick and the Trust Advisory Board.

[9] The Trust Advisory Board conceivably may have a viable claim against trustee Weisfelner for failing to keep it apprised of the Preference Claim.  *See* AC ¶ 99 (alleging Weisfelner's failure to disclose Brown Rudnick's malpractice); *cf. Karl v. Asarco Inc*., No. 02 Civ. 5565 (GBD), 2004 WL 2997872, at *10 (S.D.N.Y. Dec. 23, 2004) ("The 'duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.'" (quoting *Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993)).  That, however, is not the claim brought here.

original) (quoting *LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.*, 173 F.3d 454, 465

(2d Cir. 1999)).

Brown Rudnick argues that the AC has not adequately pled causation and damages. Def.

Mem. at 23–24. The Court agrees.[10]

Holliday first argues that the AC has alleged that the withholding of the file proximately

caused damages, because access to the client file would have saved the Trust time and resources

in evaluating and litigating its claim. *See* Pl. Mem. at 25. But, although Holliday so states in his

opposition, the AC does not allege any facts to that effect—or, for that matter, any other concrete

damages the Trust suffered from lack of access to the file. *See* AC ¶¶ 122–26, 143–48. The AC

asks only that the Court "award Plaintiff damages in an amount to be proven at trial." *Id.* ¶ 148.

That allegation is conclusory and does not plausibly allege injury to or damages suffered by the

Trust from denial of the file. *See Rahl v. Bande*, 328 B.R. 387, 418 (S.D.N.Y. 2005) (dismissing

breach of fiduciary duty claim for failure to plead damages where plaintiff pled only that "[a]s a

proximate result of the [defendants'] . . . breaches of their fiduciary duties, [plaintiff] has been

damaged in an amount to be proven at trial," which the court held to be "[a] conclusory

allegation . . . clearly insufficient to support a claim for damages"); *see also Prout*,

316 F. Supp.3d 784, 808 (S.D.N.Y. 2018) (dismissing breach of fiduciary duty claim for failure

to plead causation and damages where client alleged only that attorney's withholding of case file

---

[10] Brown Rudnick also argues that it did not breach a duty to Holliday, because Holliday has not
paid Brown Rudnick to assemble the file. *See* Def. Mem. at 23 (citing *Sage Realty Corp. v.
Proskauer Rose Goetz & Mendelsohn LLP*, 91 N.Y.2d 30, 38 (1997) ("[A]s a general
proposition, unless a law firm has already been paid for assemblage and delivery of documents to
the client, performing that function is properly chargeable to the client[.]")). Because the Court
finds this claim deficient on other grounds, the Court has not reached this argument.

forced him to resolve his case for "considerably less money than he would otherwise have received").

Holliday next contends that its claim should not be dismissed because nominal damages could be awarded on this claim.  Pl. Mem. at 25.  Be that as it may, *see Action House, Inc. v. Koolik*, 54 F.3d 1009, 1013 n.4 (2d Cir. 1995); *Juniper Entm't, Inc. v. Calderhead*, No. 07 Civ. 2413 (ADS), 2013 WL 120636, at *5–6 (E.D.N.Y. Jan. 9, 2013), the AC still falls short.  The AC does not plead damages generally related to this claim and it does not contain a prayer for nominal damages.[11]  *Hammond v. The Bank of N.Y. Mellon Corp.*, No. 08 Civ. 6060 (RMB), 2010 WL 2643307, at *11 (S.D.N.Y. June 25, 2010) (granting summary judgment for defendants because "[p]laintiffs do not include a plea for nominal damages in the Second Amended Complaint and they cannot use their motion submissions to amend their pleadings").  As such, the AC's breach of fiduciary duty claim must be dismissed.  *See Margrabe v. Sexter & Warmflash, P.C.*, 353 F. App'x 547, 549 (2d Cir. 2009) (affirming dismissal of breach of fiduciary duty claim because plaintiff "cannot make out a *prima facie* case of fiduciary duty" where she failed to allege damages directly caused by defendant's misconduct).

## CONCLUSION

For the foregoing reasons, the Court grants Brown Rudnick's motion in part and dismisses it in part.  The Court dismisses Holliday's malpractice claim for lost settlement value

---

[11] In other contexts, the Second Circuit has not required explicit pleading of nominal damages where other damages were adequately alleged but later are found too speculative.  *See Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) (breach of contract, in which nominal damages "are always available" (citation omitted)); *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 651 (2d Cir. 1998) (constitutional rights).  Here, however, the AC does not adequately allege any form of damages.

and his breach of fiduciary duty claim, but denies the motion to dismiss the malpractice claim for loss of the Preference Claim.

The Court will, by separate order, schedule an initial pretrial conference.  The Clerk of Court is respectfully directed to terminate the motions pending at dockets 12, 15, 25, and 28.

SO ORDERED.

*Paul A. Engelmayer*

_____
Paul A. Engelmayer
United States District Judge


Dated: July 28, 2020
       New York, New York